**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PERRIGO COMPANY PLC,

                        Plaintiff,           No. 15-CV-7341

             v.

MYLAN N.V.,

                        Defendant.

## COMPLAINT

Plaintiff Perrigo Company plc ("Perrigo"), by its undersigned attorneys, for its complaint against Mylan N.V. ("Mylan"), alleges as follows:

## NATURE OF THE ACTION

1.      On September 14, defendant Mylan disseminated materially false and misleading offering materials to shareholders of plaintiff Perrigo in connection with Mylan's hostile tender offer for Perrigo's shares.  Perrigo brings this action seeking an injunction preventing Mylan from closing the tender offer until it makes appropriate corrective disclosures.  This injunctive relief is necessary to ensure that Perrigo's shareholders are not forced to decide whether to accept Mylan's offer on the basis of materially false and misleading information.

2.      Mylan's tender offer is for all of the ordinary shares of Perrigo, a rival pharmaceutical company with a market capitalization of about $27 billion.  Mylan's offer gives Perrigo shareholders 60 days, until November 13, to decide whether or not to tender their shares.

3.      Mylan is using both a carrot and a stick to induce Perrigo shareholders to sell their shares.  The carrot is Mylan's claim that combining Perrigo and Mylan will yield $800 million in annual "operational synergies"—financial benefits, derived from reduced costs, that would result from the combination and benefit Perrigo shareholders who tender.  The stick is Mylan's threat

that if not enough Perrigo shareholders tender into the offer, Mylan will delist Perrigo's shares from all public stock exchanges—a move that Mylan admits will likely destroy value for Perrigo shareholders.

4.     But Mylan is not telling Perrigo shareholders the whole truth about either the carrot or the stick.  When Mylan first disclosed its $800 million synergies estimate, Mylan stated that one of the "key assumptions" underlying that figure was that Mylan would own 100% of Perrigo's shares following the tender offer.  One of the ways that Mylan said it would deliver $800 million in synergies was by "eliminat[ing] redundant public company costs"—that is, by having only one headquarters, and only one set of managers, directors, and officers, rather than two.  Mylan also repeatedly warned the market that without 100% ownership of Perrigo, Mylan's synergies estimate would be in jeopardy.

5.     The assumptions underlying Mylan's synergies estimate are no longer valid—and Mylan knows it.  Mylan now plans to close the tender offer even if it can buy only a majority stake in Perrigo, rather than 100% of the shares.  In that scenario, Perrigo would become a controlled subsidiary of Mylan with public investors owning Perrigo shares worth billions of dollars.  Mylan would have to deal with Perrigo at arms' length, and Perrigo's board of directors and management would be legally obligated to act in the interests of Perrigo and all its shareholders in any dealings with Mylan, thus constraining Mylan's ability to create synergies by consolidating the companies' operations or making changes affecting Perrigo's business.  And what is more, any synergies that Mylan *did* create in the controlled-subsidiary scenario would need to be shared proportionally with Perrigo's minority shareholders, thus reducing the benefits for Mylan and any Perrigo shareholder that decided to tender and exchange its Perrigo shares for Mylan shares.

6.     Remarkably, however, Mylan now tells Perrigo shareholders that it expects to achieve the exact same synergies dealing with Perrigo as a controlled public company as it would had it bought Perrigo out entirely.  Indeed, according to Mylan's offering materials, "the possibility of operating Perrigo as a controlled subsidiary does not change any of Mylan's key assumptions regarding the categories of operational synergies available or the potential opportunity within each category."

7.     These claims are false or misleading and cannot be reconciled with Mylan's earlier public statements.  Mylan identified complete ownership of Perrigo as a "key assumption" supporting its synergies estimate.  That "key assumption" is now gone, but Mylan nonetheless adheres to its original $800 million synergies estimate.  Mylan also identified the "[e]limination of redundant public company costs" as a specific driver for its synergies estimate.  That category of synergies is now gone as well, but once again, Mylan pretends that nothing has changed.

8.     Mylan's decision to double-down on its synergies estimate is also irreconcilable with uniform economic evidence showing that a partial acquirer cannot achieve the same synergies as a 100% owner.  Making matters worse, Mylan cites its own acquisition of Matrix Laboratories Limited ("Matrix") as supposed evidence that it can achieve complete synergies in a partial acquisition.  But the facts of that earlier transaction actually show the exact opposite: Mylan did not disclose that it expected any synergies when it first acquired a majority of Matrix's shares, and only disclosed the possibility of synergies years later, when it initiated a 100% acquisition.

9.     If Mylan no longer believes its original synergies estimate, the securities laws require it to say so, and to disclose its revised expectation.  If Mylan has an undisclosed plan for Perrigo, or if Mylan is making an undisclosed assumption to justify its continued adherence to its

original synergies estimate, Mylan must disclose that plan or assumption.  As it stands now, however, Perrigo's shareholders are confronted with unlawfully inconsistent synergies disclosures that conflict with economic reality.

10.     Mylan's threat to delist Perrigo shares likewise violates the securities laws. Mylan has told Perrigo shareholders that if they refuse to sell all their shares, Mylan "intends to cause Perrigo to delist" its shares from the New York Stock Exchange and other public markets. This would leave Perrigo shareholders—representing at least $5 billion, and potentially as much as $13 billion of investment value—holding largely illiquid shares, consigned to a "dark pool" that will substantially impair their value.  Mylan's delisting threat has been condemned as an attempt to strong-arm Perrigo shareholders into selling their shares.

11.     Contrary to what Mylan has disclosed, Mylan does not have the power to delist Perrigo's shares—only Perrigo's directors, acting in the interest of Perrigo and *all* of its shareholders, can do that.  Mylan's disclosures must be corrected to acknowledge the legal fact that Mylan does not have the power to cause Perrigo to delist.  Moreover, to the extent Mylan's plan is to pack the Perrigo board with directors who pledge in advance to delist Perrigo's shares, that litmus test is material information and must be disclosed.

12.     Mylan's disclosures are also insufficient given the evident illegality of the threatened delisting.  In view of Mylan's concession—and the incontrovertible economic fact—that delisting will harm Perrigo shareholders, the Perrigo board could not legally proceed with delisting, even at Mylan's urging, without some legitimate basis.  But Mylan has not identified any rationale that could possibly support a decision by the Perrigo board to delist its shares.  In the unlikely event such a rationale exists, it is material information that must be disclosed.  If not, Mylan's delisting threat cannot be lawfully acted upon and is designed only to scare Perrigo

shareholders.  In either case, corrective disclosure is required.  Otherwise, Perrigo shareholders will be forced to decide whether to tender in the face of a threat that Mylan will act to destroy the value of their investment, with no ability to evaluate whether the threat is real.

13.     Based on the facts alleged herein, Perrigo asserts claims for injunctive and declaratory relief against Mylan under Section 14(e) of the Securities Exchange Act of 1934 (the "Exchange Act").

## THE PARTIES

14.     Plaintiff Perrigo is a manufacturer of generic and over-the-counter drugs marketed to the public under the labels of pharmacy retailers like CVS, Walgreens, and Walmart. Although Perrigo is incorporated under the laws of Ireland, its main administrative offices are in Michigan, and Perrigo has manufacturing operations around the United States.  Perrigo's shares are listed on the New York Stock Exchange under the ticker symbol "PRGO."

15.     Defendant Mylan is also a manufacturer of generic drugs.  Mylan is organized under the laws of the Netherlands, is headquartered in Pennsylvania, and maintains substantial manufacturing operations around the country.  Mylan's shares are listed on the NASDAQ under the ticker symbol "MYL."

16.     Non-party Robert Coury ("Coury") is the Executive Chairman and a Non-Executive Director of Mylan.

17.     Non-party Heather Bresch ("Bresch") is the Chief Executive Officer and an Executive Director of Mylan.

## JURISDICTION AND VENUE

18.     This action arises under Section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e), and the rules and regulations promulgated thereunder.

19.     Jurisdiction over the subject matter is based on 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

20.     Mylan is subject to personal jurisdiction in this district, among other reasons, because this action arises out of and relates to Mylan's tender offer for the shares of Perrigo, an NYSE-traded company with shareholders residing in this district, and because, upon information and belief, Mylan regularly conducts business in the State of New York and derives substantial revenue from goods and services sold within the State of New York.

21.     Venue in this district is proper pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

**Mylan's Pursuit of Perrigo**

22.     On April 6, 2015, Mylan made a "non-binding proposal" to buy Perrigo for a price of $205 per Perrigo share, which it publicly announced two days later.  Along with the proposal, Mylan sent Perrigo a public letter asserting that a combination of the companies would result in "substantial revenue and operating synergies."  Perrigo's board of directors rejected Mylan's offer on April 21 because it "substantially undervalues Perrigo and its growth prospects."

23.     Mylan revised its proposal on April 24, reducing its offer to $60 in cash and 2.2 Mylan shares per Perrigo share, for a total value of approximately $182 (based on the market price of Mylan's shares on March 10).  Mylan designated its revised proposal as a "firm intention" under the Irish Takeover Rules, a step that legally obligated Mylan to make a tender offer for Perrigo's shares.

24.     Mylan's April 24 offer was conditioned on it obtaining at least 80% of Perrigo's shares in the tender offer.  Under governing Irish corporate law, Mylan could "squeeze out" any

remaining Perrigo shareholders—that is, force them to sell their shares—if Mylan acquired at least 80% of Perrigo's shares in the tender offer.  Thus, if 80% of Perrigo shares tendered, Mylan stated that it would close the offer and buy-out the remaining shareholders at the same price, thus acquiring 100% of Perrigo's shares and with it unfettered control of the company.  But if fewer than 80% of the shares tendered, the offer would fail, and Mylan would buy no shares at all.

25.    Mylan included in its April 24 disclosure a "Synergy Statement," which asserted that "Mylan expects the combination [of Mylan and Perrigo] will result in at least US$800 million of annual pre-tax operational synergies by the end of year four following the consummation of the offer."  A "key assumption" underlying the synergies estimate was that "following the consummation of the Offer, Mylan will acquire compulsorily any Perrigo Shares not acquired or agreed to be acquired pursuant to the Offer or otherwise."

26.    The specific types of synergies that Mylan identified in the Synergy Statement included "[o]ptimizing global back-office, manufacturing, selling and distribution infrastructure"; "[c]ost efficiencies and operating leverage resulting from increased scale"; "[r]esearch and development savings from elimination of overlapping costs"; and "[e]limination of redundant public company costs."  At the time, Mylan stated that "[t]he transaction is expected to be immediately accretive to EPS on a fully-synergized basis and it is anticipated that substantial free cash flows will drive rapid deleveraging and enhanced reinvestment into the business, with the combined company expected to maintain its investment grade credit profile."

27.    Mylan attached to the Synergy Statement reports from Goldman Sachs and PricewaterhouseCoopers, which were apparently "given for the purpose of complying with" the requirements of Irish law and to lend the imprimatur of expert authority to the Synergy Statement.  The reports contained no analysis of the available categories of synergies or the

opportunities within each category and expressed no opinion on whether the synergies would be or could be realized.  Indeed, the reports expressly disavowed "any independent examination of any of the financial or other information underlying" the Synergy Statement.

28.     Mylan's ability to achieve the claimed operational synergies is one of the most important considerations for Perrigo shareholders deciding whether to tender their shares to Mylan.  The question confronting Perrigo shareholders is whether the per share consideration that Mylan is offering is more or less valuable than a share of Perrigo under Perrigo's current business plan.  And because tendering shareholders will become shareholders of Mylan—by virtue of the fact that roughly 60% of the offered consideration is Mylan stock—the value of Mylan as an investment going forward will be critical to the Perrigo shareholders' analysis.

29.     Perrigo's board rejected Mylan's April 24 offer, again on the ground that it substantially undervalued Perrigo.  Mylan revised its offer again on April 29.  The further revised offer was $75 in cash and 2.3 Mylan ordinary shares per Perrigo ordinary share, representing a total value of approximately $202 per share (based on the market price of Mylan's shares on March 10).  Perrigo's board rejected this offer as well, noting that it was once again less valuable than Mylan's insufficient original offer.

30.     Mylan announced its quarterly earnings for the first quarter of 2015 on May 5. During the earnings call with financial analysts, Bresch made remarks about Mylan's pursuit of Perrigo in which she highlighted as a "key strategic and financial benefit[]" of the offer the fact that Mylan "expect[s] to achieve annual pretax operational synergies of at least $800 million fully realizable by year four after closing."

31.     NASDAQ listing rules required Mylan to obtain the approval of its shareholders before commencing the tender offer.  Thus, on July 28, Mylan announced that it would seek such approval at an August 28 shareholders meeting.

32.     On that same date, Mylan issued a proxy statement soliciting Mylan shareholder support for its proposed offer.  The proxy statement reiterated that Mylan "expects the combination of Mylan and Perrigo will result in at least $800 million of annual pre-tax operational synergies by the end of year four following the consummation of the Transaction," which "are expected to come from savings associated with integration and optimization across cost components and functions of the combined company."  Mylan's disclosure also reaffirmed the key assumption that it would be able to effect a compulsory squeeze out of the remaining Perrigo shareholders and combine the two companies following completion of the tender offer.

33.     Mylan's proxy statement cautioned, however, that Mylan could reduce the minimum acceptance condition from 80% of Perrigo's outstanding shares to a bare majority— 50% plus one share—in which case Mylan "would not be able to acquire compulsorily the remaining Perrigo ordinary shares we do not own," leaving Perrigo as a partially owned subsidiary of Mylan.  In that scenario, Mylan emphasized, the "full amount of the expected operational and other synergies identified for Mylan may not be obtained or may only be obtained over a longer period of time."

**Mylan Reduces the Minimum Acceptance Condition**

34.     This contingency materialized on August 13, when Mylan announced that it would lower the minimum acceptance condition for its tender offer to 50% plus one share.

35.     Mylan made this change due to concern that it would not reach the 80% threshold. As Institutional Shareholder Services ("ISS"), a leading proxy advisory firm, put it, "[i]n rolling back its minimum tender condition . . . Mylan appears to have signaled that less than 80% of

Perrigo shares are likely to be tendered at this valuation."  Jefferies likewise observed that "getting 80% of PRGO shareholders to tender their stake will be extremely challenging for MYL, particularly given the recent collapse in the share price" of Mylan.  And RBC similarly cautioned:  "We continue to see a deal as unlikely though we do think the Aug 28 MYL shareholder vote can pass, with the bigger hurdle being the PRGO vote."

36.      Mylan's decision to reduce the minimum acceptance condition also triggered concern in the market that Mylan could not achieve the synergies on which the deal was premised, since Perrigo would continue to operate as an independent company.

37.      Moody's, for example, noted that by reducing the threshold, Mylan had "raise[d] the possibility of a long, drawn out process that could continue indefinitely" and created "integration and execution risk."  Moody's further observed that if Mylan acquired anything less than 80% of Perrigo's shares, "Mylan will be left as a majority shareholder in Perrigo but a clear path to completing the acquisition of 100% of the company [was] not evident," which "raises questions about how the two companies could be integrated and if Mylan would be able to fully realize the synergies that it believes could be achieved."  And "the realization of these synergies will be key to growing earnings and deleveraging."  As a result, Moody's concluded that "this development"—reducing the acceptance threshold—"puts additional downward pressure on Mylan's investment grade rating."

38.      ISS made similar remarks in a report recommending that Mylan's shareholders reject the tender offer.  ISS observed that even if Mylan were to achieve its full synergies estimate of $800 million, the offer did not "make for a very compelling economic outlook:  by management's own prognosis, those synergies will not turn this hugely dilutive deal accretive until year four."  But by reducing the threshold, ISS worried, Mylan had made the economics

even worse, introducing the possibility that Mylan could be left "with an enormous investment in another publicly-traded company which it cannot fully integrate, and whose cash flows it cannot easily redeploy to repay the debt required for the acquisition."

39.     ProxyMosaic joined ISS in recommending that Mylan's shareholders reject the tender offer.  Observing that "Mylan's argument in favor of the acquisition has centered on the potential synergies," ProxyMosaic referred to the potential of Mylan acquiring less-than-complete control as a "doomsday scenario" and a "no man's land," where Mylan could not "effectuate even the most basic synergies."  The reason was that "[w]ith its simple majority, [Mylan] will be able to replace Perrigo's board, but any real attempts to implement further consolidation, and therefore realize any cost synergies, will be effectively stalled, as the two companies will continue to operate separately and Perrigo will remain publicly traded."  Hence, by lowering the minimum acceptance condition, Mylan "has created the possibility of an untenable mess," and raised a "very real risk of substantial value destruction."

**Mylan Reaffirms Its Original Synergies Estimate**

40.     With the August 28 vote of its shareholders approaching, Mylan sought to respond to the concerns that had been raised in the market about the impact of Mylan's decision to reduce the minimum acceptance condition on deal synergies.

41.     On August 10, during Mylan's earnings call for the second quarter of 2015, Bresch personally downplayed the risks of Mylan owning greater than 50% but less than 80% of Perrigo's shares, stating that "I would not say there is any operational complexity."  Bresch further elaborated that Mylan would be quickly "taking over" the Perrigo board "[a]nd then, so once that happens, you've got full operational control of the company.  So, it really allows you to be running the company with 50 plus 1% of the vote in a very short period of time."

42.     On August 14, Mylan issued a press release in which Coury responded to the
negative ISS report, in particular.  Coury criticized ISS for purportedly "fail[ing] to comprehend
the potential for medium and long-term value creation for Mylan shareholders, the compelling
synergy opportunity, the potential for meaningful multiple expansion, and the ability to take
advantage of the continuing consolidation in our industry."  And responding to the concern ISS
had raised that by lowering the minimum acceptance condition to a bare majority, Mylan had
jeopardized its ability to integrate Perrigo—and thus realize full operational synergies—Coury
stated:  "We remain firm that we expect at least $800 million of annual pre-tax operational
synergies by the end of year four."

43.     Echoing these themes, Mylan issued a supplemental proxy filing to its
shareholders on August 20, eight days before the Mylan special meeting.  Discussing the
scenario in which it acquired more than 50% but less than 80% of Perrigo's shares, Mylan said
that it might operate Perrigo as a "controlled subsidiary" for the foreseeable future.  Mylan
allowed that in the "controlled subsidiary" scenario, "[t]he arrangements necessary to implement
the operational synergies between Mylan and Perrigo would need to be . . . on an arms-length
basis," which could "require Mylan to pursue different steps to realize operational synergies than
it would pursue if it owned 100% of Perrigo's ordinary shares and could potentially result in a
delay in realizing the anticipated operational synergies."

44.     Notwithstanding all this, and even though Mylan had previously disclosed that
acquiring 100% control of Perrigo was a "key assumption" underlying its synergies estimate and
that the failure of that assumption would jeopardize its ability to realize the "full amount" of
synergies,  Mylan stated in its supplemental proxy filing that "the possibility of operating Perrigo
as a controlled subsidiary does not change any of Mylan's key assumptions regarding the

categories of operational synergies available or the potential opportunity within each category" and told its shareholders that it "continues to believe that the Transaction will result in at least $800 million of annual pre-tax operational synergies."

45.     Following Mylan's release of the supplemental proxy filing, ISS issued a report on August 21, in which it expressed the view that "if Mylan does not also cross the 80% threshold required for a minority squeeze out," Mylan may be placed in the "untenable position as controlling shareholder of a firm it cannot fully integrate," and thus "unable . . . to realize the full synergies it envisions."

46.     Coury responded to these statements from ISS in a press release that Mylan issued on August 21, wherein Coury purported to "clarify certain implications" of the reduced acceptance threshold by personally reiterating the claim that Mylan "continues to believe that the combination can realize annual pre-tax anticipated operational synergies of at least $800 million from the combined operations by the end of year four."

47.     Throughout this period, Mylan's public filings and investor presentations continued to identify "operational synergies" as the principal economic rationale for the proposed combination.  An investor presentation released by Mylan on August 10, for instance, identified only two drivers of value creation in the transaction—potential synergies and price-to-earnings multiple expansion.  Using Mylan's own assumptions, the presentation showed that Mylan's estimated $800 million in synergies would translate into $10 to $14 dollars in value for the combined company on a per share basis, and would thus increase the combined company's market capitalization by $8 billion to $12 billion dollars, depending on the combined company's price-to-earnings multiple.

48.     In the August 20 supplemental proxy filing, Mylan also stated that in the controlled-subsidiary scenario, it "intends to cause" Perrigo to delist its shares from public stock exchanges "as soon after consummation of the offer as is practicable."

49.     Mylan did not disclose any business reason for the planned delisting or identify any precedent for the delisting of shares representing up to approximately $15 billion in public investment.  Nor did Mylan explain in the supplemental proxy filing how it could "cause" Perrigo to delist its shares.

50.     The delisting threat thus appears to be purely coercive, designed to intimidate Perrigo shareholders into tendering their shares.  The *Wall Street Journal* called the delisting threat "troubling," reasoning that it "would likely put further pressure on Perrigo shareholders to accept the offer if Mylan reaches a majority."  As the *Wall Street Journal* elaborated, "[w]hat is remarkable about this intention is that even though Mylan would be able to elect the entire board, those directors would have duties to all shareholders—including those that could be harmed by a decision to delist."

51.     Professor Jeffrey Sonnenfeld from the Yale School of Management echoed these views in *Fortune*.  Specifically, Professor Sonnenfeld noted the "clear . . . coercive intent" of Mylan's "threat[] to delist and weaken Perrigo, punishing prospective minority shareholders," while at the same time questioning "how Mylan could achieve such a result, given Irish law protections and the need for a future board to deliberate with Perrigo's interests in mind."

52.     On August 28, Mylan held the extraordinary meeting, at which Mylan shareholders voted to authorize Mylan to proceed with the tender offer.

**Mylan Launches Its Tender Offer**

53.     On September 8, Mylan released a letter to Perrigo from Coury announcing that Mylan would formally launch its tender offer on September 14.

54.   Coury's letter purported to address "concerns about the process to take control of Perrigo in the highly unlikely event we receive more than 50% but less than 80% of shares tendering into our offer."  Coury stated, "we believe [obtaining fewer than 80% of Perrigo's shares] will not impact our ability to realize our projected synergies for the combination of at least $800 million."  Coury also claimed that Mylan had "experience operating companies in such a scenario and are very comfortable that we will achieve the right outcome."

55.   Mylan formally launched its tender offer on September 14.  By the offer's terms, Perrigo shareholders electing to tender their shares stand to receive $75 in cash and 2.3 Mylan shares for each Perrigo share.  At current market prices, the tender offer values Perrigo at approximately $188 on a per share basis, with approximately 60% of the value of the offer in the form of Mylan shares.  The tender offer is scheduled to expire at 8:00 AM (EDT) on November 13.

56.   In connection with the formal launch of the tender offer, Mylan made available to Perrigo shareholders a Schedule TO and a Prospectus / Offer to Exchange, the contents of which are incorporated by reference into the Schedule TO.  The issuance of these offering materials was required by applicable law and SEC rules.

57.   Mylan discloses in the offering materials that if it acquires more than 50% but less than 80% of Perrigo shares in the tender offer, "Mylan intends to operate Perrigo as a controlled subsidiary."  Mylan claims, however, that "the possibility of operating Perrigo as a controlled subsidiary does not change any of Mylan's key assumptions regarding the categories of operational synergies available or the potential opportunity within each category," and therefore "Mylan continues to believe that the offer will result in at least $800 million of annual pre-tax operational synergies by the end of year four following consummation of the offer."  Mylan

makes this claim notwithstanding its acknowledgement elsewhere in the offering materials that "Mylan shareholders may not realize the full financial benefits of operational synergies" in the controlled-subsidiary scenario because such "financial benefits may be shared by the minority shareholders of Perrigo."

58.     The offering materials also repeat Mylan's delisting threat, stating that in the controlled-subsidiary scenario, "Mylan intends to cause the delisting" of Perrigo shares from all public exchanges "as soon as practicable" following consummation of the tender offer.  Mylan warns that as a result, Perrigo shares "may become illiquid and may be of reduced value." Mylan also discloses that the minority shareholders of Perrigo could bring "legal challenges in the Irish courts" and allege that delisting was an "oppressive action[]" that benefitted Mylan at the minority shareholders' expense.

59.     Mylan's offering materials also expressly represent that Mylan does not have any undisclosed "plans or proposals" for Perrigo that would result in "any change in the present Perrigo board of directors or management" or "any other material change in Perrigo's corporate structure or business."

**Mylan's False and Misleading Statements
in Connection With the Tender Offer**

60.     Mylan has made numerous materially false and misleading disclosures in the offerings materials and in other public statements made in connection with the tender offer.

61.     Mylan claims in the offering materials that even if it does not achieve 100% ownership and Perrigo remains a "controlled subsidiary" following the tender offer, "Mylan continues to believe that the offer will result in at least $800 million of annual pre-tax operational synergies by the end of year four following consummation of the offer."  Coury made a similar claim in his September 8 letter, stating that failing to obtain 100% ownership of Perrigo "will not

impact [Mylan's] ability to realize our projected synergies for the combination of at least $800 million."

62.     These disclosures are false or misleading.  Either Mylan does not believe what it claims to believe, or Mylan is concealing material plans or assumptions that, in Mylan's view, justify adherence to Mylan's original synergies estimate.  In either case, Mylan is violating Section 14(e) of the Exchange Act.

63.     Mylan repeatedly and publicly made clear in the months before it decided to reduce the minimum acceptance condition that Mylan expected operational synergies of at least $800 million per year based on the "key assumption" that Mylan would acquire all of Perrigo's shares.  Mylan told its own shareholders that if this "key assumption" proved false and Mylan had to operate Perrigo as a controlled subsidiary, the "full amount of the expected operational and other synergies . . . may not be obtained or may only be obtained over a longer period of time."  And Mylan identified a specific synergies category—the "[e]limination of redundant public company costs"—that only made sense in the context of the 100% ownership assumption.  But having now reduced the minimum acceptance condition, Mylan claims that it expects to achieve exactly the same synergies even though this "key assumption" is no longer valid.

64.     Mylan's adherence to its $800 million synergies estimate is also inconsistent with other statements in the offering materials.  Mylan has acknowledged, for example, that its ability to influence Perrigo's operations will be adversely affected in a "controlled subsidiary" scenario because Mylan's dealings with Perrigo would need to be on an "arms-length basis."  Indeed, under controlling Irish law, Mylan will be constrained from implementing operational changes that are detrimental to Perrigo and its minority shareholders in the controlled-subsidiary scenario, because Perrigo's directors—even directors elected by Mylan post-tender offer—would continue

to owe enforceable fiduciary duties to Perrigo's public shareholders.  Accordingly, any business arrangements between the two companies would need to occur, if they were to occur at all, at market rates.  That would in turn necessarily reduce or eliminate the synergies available to Mylan and its shareholders.

65.     Mylan also concedes in the offering materials that any synergies that are created in the controlled-subsidiary scenario will need to be "shared [with] the minority shareholders of Perrigo," thus preventing Mylan shareholders—including any former Perrigo shareholders that tender their shares to Mylan—from "realiz[ing] the full financial benefits of operational synergies."  This means that the synergies available to Mylan shareholders will necessarily be reduced in the controlled-subsidiary scenario, because they will necessarily be shared with public shareholders of Perrigo that will own 20% to 50% of Perrigo.  This inescapable fact confirms that the synergies available to Mylan in the controlled-subsidiary scenario must be less than in the whole-company acquisition scenario, rendering Mylan's insistence to the contrary false.

66.     Mylan's unchanged synergies estimate is also inconsistent with economic common sense.  Economists have long recognized that "when operational synergies have motivated an acquisition, the need for links between the combining organizations is high."[1]  As one recent study summarized the academic literature, "[f]ocus-increasing acquisitions offering synergistic gains from operating efficiencies and economies of scale necessarily require high levels of integration."[2]

67.     Recent comparable transactions involving pharmaceutical companies reinforce the point.  In 1990, Roche, a healthcare and pharmaceutical company, purchased a controlling

---

[1]  Amy L. Pablo, "Determinants of Acquisition Integration Level:  A Decision-Making Perspective," 37 Acad. of Mgmt. J. 803, 808 (1994).

[2]  Sorin Daniliuc et al., "The Interaction of Post-Acquisition Integration and Acquisition Focus in Relation to Long-Run Performance," 14 Int'l Rev. of Fin. 587, 591 (2014).

stake in Genentech, a biotech company, in a friendly transaction involving 56% of Genentech's shares.  Roche proceeded to run Genentech as a controlled subsidiary until 2009, when it purchased the remaining shares.  Even though Roche controlled Genentech for almost 20 years, and despite every incentive to maximize synergies during that time, Roche predicted at least $750 million in synergies arising from the full acquisition.  Similarly, Novartis, a healthcare company, acquired 77% of Alcon, an eye-care company, in August 2010.  Months later, when Novartis announced an acquisition of the remaining stake, it predicted $100 million in synergies uniquely attributable to obtaining 100% control—including synergies in some of the same categories Mylan has identified with respect to Perrigo.

68.     For these reasons, Mylan's statements that it expects to realize the same synergies as a majority owner of a public Perrigo as it would if it owned Perrigo outright must be corrected.  Either Mylan does not really expect to achieve the same $800 million in synergies, in which case Mylan's disclosures are false, or Mylan has some undisclosed plan to achieve those synergies, in which case its disclosures are insufficient as well.  No matter the explanation, as they currently stand, Mylan's disclosures about expected synergies deprive Perrigo shareholders of any meaningful opportunity to evaluate the tender offer.

69.     Mylan's offering materials also state:  "[T]he possibility of operating Perrigo as a controlled subsidiary does not change any of Mylan's key assumptions regarding the categories of operational synergies available or the potential opportunity within each category."

70.     This disclosure is false and must be corrected, because at least two of Mylan's original assumptions underlying its synergies estimate *did* change once Mylan reduced the minimum acceptance threshold to a bare majority.  To begin with, one of Mylan's "key

assumptions" was that it would achieve 100% control of Perrigo, and that assumption would be inapplicable by definition in a partial acquisition scenario.

71.     In addition, now faced with the risk that it will be forced to operate Perrigo as a controlled subsidiary, Mylan does not include in the offering materials any mention of the "[e]limination of redundant public company costs," a category of synergies that Mylan specifically identified when it first disclosed the $800 million synergies estimate.  The synergies from this important category are lost in the event Mylan operates Perrigo as a controlled subsidiary with its own board, its own CEO, its own CFO, its own management team, and its own headquarters.  For this additional reason as well, Mylan's claim that none of its assumptions have changed is false, and that statement must be corrected.

72.     Likewise false is Mylan's claim that operating Perrigo as a controlled subsidiary does not change the "opportunity within each [synergies] category."  The categories of synergies that Mylan identifies cannot be fully achieved unless Mylan is prepared to use its controlling position to cause Perrigo to make operational changes that would substantially impair Perrigo's business.  But in the controlled-subsidiary scenario, Perrigo will continue to have a board of directors obligated to maximize the value of Perrigo (not Mylan) and whose members will answer to all Perrigo shareholders (not just Mylan).

73.     Mylan thus recognizes that the "arrangements necessary to implement the operational synergies between Mylan and Perrigo" will be negotiated on an "arms-length basis." Given all this, Mylan's claim that the achievable synergies within each of the categories it has identified remain unchanged is simply not true.

74.     Mylan also states in the offering materials that "based on its prior experience integrating other acquired companies, including [Matrix], which Mylan acquired less than 100%

of in 2007 and operated as a controlled subsidiary until 2015, that it can successfully manage the additional risks" of operating Perrigo as a controlled subsidiary and that "the combination can realize the anticipated operational synergies from the offer."  And Coury stated in his September 8 letter that Mylan's "experience operating companies in [this] scenario" made Mylan "very comfortable" that it would achieve its synergies estimate.

75.    These disclosures are misleading and must be corrected.  Mylan repeatedly suggests that its experience with Matrix supports the claim that it can extract full synergies even if Perrigo remains a controlled subsidiary, but the actual facts of the Matrix transaction actually support the opposite conclusion.  Mylan purchased a majority stake in Matrix in 2007, making Matrix a controlled public subsidiary.  But Mylan did not disclose any expected synergies in the 2007 controlled-subsidiary transaction.  It was not until 2009, when Mylan announced a plan to acquire 100% of Matrix's shares, that Mylan spoke of synergies, telling shareholders that "[p]urchasing the remaining interest in Matrix . . . will provide Mylan an opportunity for enhanced flexibility and efficiencies in managing our global technical and commercial operations platform"; "enhance[] the ease of operations between the companies and increase[] operational efficiencies"; and "produce additional efficiencies."  The failure to disclose any of these facts in the offering materials renders Mylan's statements about Matrix misleading.

76.    Furthermore, the Matrix acquisition is materially different in several dimensions from the proposed Mylan / Perrigo transaction.  For example, the Matrix acquisition was friendly, whereas the proposed Perrigo acquisition is not, making it empirically less likely to experience synergies.  And the Matrix acquisition was also orders of magnitude smaller with more readily achievable synergies, narrowly focused on "vertical integration" and "enhanc[ing] [Mylan's] supply chain capabilities."  Here, Mylan has identified much broader categories of

operational synergies that were not implicated by the Matrix acquisition.  Mylan's failure to disclose these distinguishing facts, while presenting Matrix as a comparable transaction, likewise renders Mylan's disclosures misleading.

77.    Mylan also states in the offering materials that even if Perrigo shareholders continue to hold Perrigo shares following the consummation of the offer, Mylan "intends to cause Perrigo to delist" its shares from public stock exchanges "as soon after consummation of the offer as is practicable," causing Perrigo's shares to "become illiquid" and lose value.  Mylan has made this delisting threat with the intent to coerce Perrigo shareholders to tender their shares, even if they do not believe Mylan is paying fair value, as market commentators have recognized.

78.    Mylan's delisting threat disclosure is false or misleading or both and must be corrected.  For starters, Mylan does not have the power to "cause Perrigo to delist" its shares. Whether to delist Perrigo's shares is up to the directors of Perrigo, who will continue to owe fiduciary duties to Perrigo and all of its shareholders even if they have been elected by Mylan. In short, the decision whether to delist Perrigo's shares is not Mylan's to make, and Mylan must correct its statement to the contrary.

79.    For similar reasons, Mylan must correct Bresch's statement on August 10 that Mylan would be able to "tak[e] over" the Perrigo board in a partial acquisition scenario giving it "full operational control of the company."  Once again, even if a majority of Perrigo's board has been elected by Mylan, Perrigo's directors will remain legally obligated to act in the best interests of all of Perrigo's shareholders.

80.    Moreover, if Mylan plans to install only Perrigo directors who pledge in advance to delist Perrigo's shares, then that plan is material information that must be disclosed.  And if Mylan has any other agreements or understandings with prospective Perrigo directors, they must

be disclosed as well, to correct Mylan's claim in the offering materials that no such agreements or understandings exist.

81.     Nor can Mylan correct its delisting threat statements by disclosing that it intends to persuade a future Perrigo board—comprised of directors elected by Mylan—to delist Perrigo's shares.  There is no precedent anywhere for delisting shares worth billions of dollars on public markets, precisely because delisting is generally contrary to the interest of shareholders.  Mylan recognizes as much, and has disclosed that delisting would likely cause Perrigo's shares to lose value and that Perrigo's minority shareholders would likely sue, under Irish law, to block any effort to delist.  Indeed, absent some reason for delisting that serves the interests of all Perrigo shareholders, Perrigo's board, even if dominated by Mylan, could not lawfully cause Perrigo to delist, and a lawsuit challenging delisting would be meritorious on its face.

82.     But Mylan has never articulated any reason for delisting Perrigo's shares, much less a reason that would suffice under Irish law.  If Mylan cannot identify such a reason, then it cannot carry out its delisting threat, and must withdraw it.  If Mylan professes to know of such a reason—an implausible scenario to say the least—then that supposed reason is material information that must be disclosed.  Either way, corrective disclosure is required to ensure that Perrigo shareholders are not forced to decide whether or not to sell their shares without knowing whether Mylan's threat to "cause" the delisting of Perrigo's shares is remotely credible.

### COUNT I – CLAIM FOR INJUNCTIVE RELIEF FOR VIOLATION OF SECTION 14(e) OF THE EXCHANGE ACT

83.     Perrigo repeats and realleges the allegations set forth in Paragraphs 1 through 82 of this complaint as if fully set forth herein.

84.     Section 14(e) of the Exchange Act provides, in relevant part:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make

the statements made, in the light of the circumstances under which they
are made, not misleading . . . in connection with any tender offer . . . or
any solicitation of security holders in opposition to or in favor of any such
offer . . . .

85.　Mylan disseminated offering materials to Perrigo's shareholders and made other
statements in connection with Mylan's tender offer that contained false and misleading
disclosures.

86.　Mylan's false and misleading disclosures in the offering materials and in its other
statements made in connection with the tender offer are material because there is a substantial
likelihood that Perrigo shareholders would consider the omitted facts significant in making a
decision as to whether to tender their Perrigo shares to Mylan.

87.　If Mylan is permitted to proceed with its offer without correcting the materially
false and misleading statements described herein, Perrigo's shareholders will be irreparably
injured, because they will be forced to respond to Mylan's tender offer on the basis of materially
false and misleading information.

## COUNT II – CLAIM FOR DECLARATORY RELIEF
## PURSUANT  TO 28 U.S.C. § 2201

88.　Perrigo repeats and realleges the allegations set forth in Paragraphs 1 through 87
of this complaint as if fully set forth herein.

89.　An actual and ripe controversy exists between the parties in that Mylan has made
a tender offer for all outstanding shares of Perrigo and disseminated offering materials to Perrigo
shareholders and made other statements in connection with the tender offer that contain false and
misleading disclosures.

90.　If Mylan's material misrepresentations and omissions are not corrected, Perrigo
shareholders will be forced to respond to Mylan's tender offer on the basis of materially false
and misleading information.

91.     As a result of the foregoing, Perrigo seeks an order declaring that Mylan's offering materials and other statements made in connection with the tender offer are materially false and misleading in violation of Section 14(e) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Perrigo respectfully requests that the Court enter judgment against Mylan as follows:

a)      declaring that the offering materials disseminated by Mylan to Perrigo shareholders on September 14, 2015 are materially false and misleading and therefore violate Section 14(e) of the Exchange Act;

b)      declaring that the other statements made by Mylan to Perrigo shareholders in connection with its tender offer, as specifically identified herein, are materially false and misleading and therefore violate Section 14(e) of the Exchange Act;

c)      directing Mylan to provide corrective disclosures to Perrigo shareholders, which, at a minimum, shall consist of calling specific attention to Mylan's prior false and misleading statements and acknowledging the specific way in which such statements were false or misleading;

d)      enjoining Mylan from closing the tender offer until Mylan issues full and complete corrective disclosures, including giving Perrigo shareholders adequate time to review and consider the corrective disclosures;

e)      ordering Mylan to accept any duly transmitted withdrawals submitted by, or on behalf of, Perrigo shareholders during a reasonable period following the issuance of corrective disclosures by Mylan, irrespective of any actual or purported expirations or the purported termination of the right of Perrigo shareholders to withdraw tendered shares;

f)      permanently enjoining Mylan from making any further false or misleading disclosures in connection with its tender offer in the future; and

g)      granting such other non-monetary relief as the Court deems just and proper.

Dated: September 17, 2015          WACHTELL, LIPTON, ROSEN & KATZ

*/s/* William Savitt
William Savitt

Bradley R. Wilson
Charles D. Cording
Jordan L. Pietzsch
Ishpuneet K. Chhabra
51 West 52nd Street
New York, NY 10019
Tel:  (212) 403-1000
Fax:  (212) 403-2000

*Attorneys for Plaintiff Perrigo Company plc*