UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
PERRIGO COMPANY PLC,

                Plaintiff-
                Counterclaim-            **MEMORANDUM AND**
                Defendant,
                                            **O R D E R**
     - against -

MYLAN N.V.,
                                  15 Civ. 7341 (NRB)

                Defendant-
                Counterclaim-
                Plaintiff.
-----------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


     Plaintiff-counterclaim-defendant Perrigo Company plc ("Perrigo") and defendant-counterclaim-plaintiff Mylan N.V. ("Mylan") have each moved for a preliminary injunction in connection with Mylan's tender offer to buy shares of Perrigo. Each company accuses the other of making false and misleading statements directed at Perrigo shareholders in violation of Section 14(e) of the Securities Exchange Act (the "Exchange Act"), 15 U.S.C. § 78n(e).[1]  For the reasons set forth below, we deny both motions in their entirety.

---

[1] Section 14(e) was originally added to the Exchange Act as part of the Williams Act of 1968 (the "Williams Act").

**BACKGROUND[2]**

This action arises out of a hostile takeover fight between two large pharmaceutical companies. Perrigo is a manufacturer of generic drugs and over-the-counter healthcare products incorporated under the laws of Ireland, with its administrative offices in Michigan. Its shares are listed on the New York Stock Exchange ("NYSE") and the Tel Aviv Stock Exchange ("TASE"). Mylan is a manufacturer of generic and branded drugs, and its shares are traded on the NASDAQ.

On April 6, 2015, Mylan sent a nonbinding proposal to the Perrigo board of directors to purchase Perrigo for a price of $205 per share. Mylan publicly announced the offer two days later, and on April 21, Perrigo's board of directors rejected it, concluding that it "substantially undervalues Perrigo and its growth

---

[2] The facts recited in this opinion are drawn from the following sources: (1) the Declaration of Bradley R. Wilson in Support of Perrigo's Motion for a Preliminary Injunction ("Wilson Decl."), and the exhibits attached thereto, including the depositions of John Sheehan ("Sheehan Dep.") and Robert Coury ("Coury Dep."); (2) the Declaration of Stefan H. Atkinson in Support of Defendant/Counterclaim-Plaintiff Mylan N.V.'s Motion for Preliminary Injunction ("Atkinson Decl."), and the exhibits attached thereto; (3) the Declaration of Bradley R. Wilson in Opposition to Mylan N.V.'s Motion for a Preliminary Injunction ("Wilson Opp. Decl."), and the exhibits attached thereto, including the deposition of Joseph Papa ("Papa Dep."); (4) the Declaration of Sandra C. Goldstein in Opposition to Plaintiff/Counterclaim-Defendant Perrigo Company PLC's Motion for Preliminary Injunction ("Goldstein Decl."), and the exhibits attached thereto; (5) the Supplemental Declaration of Stefan H. Atkinson in Support of Defendant/Counterclaim-Plaintiff Mylan N.V.'s Motion for Preliminary Injunction ("Supp. Atkinson Decl."), and the exhibits attached thereto; and (6) Defendant/Counterclaim-Plaintiff Mylan N.V.'s Bench Book Re: Perrigo's Motion for Preliminary Injunction, and the exhibits attached thereto ("Mylan Bench Book").

prospects." Wilson Decl., Ex. F at 6. On April 24, Mylan revised its offer to $60 in cash and 2.2 shares of Mylan stock, and designated the offer as a "firm intention" under Rule 2.5 of the Irish Takeover Rules, a step that legally obligated Mylan to make a tender offer for Perrigo's shares (the "Rule 2.5 Announcement").

Mylan's offer was conditioned upon Mylan's receipt of at least 80% of the outstanding ordinary shares of Perrigo (the "Acceptance Condition"). Under Irish law, reaching the 80% threshold would allow Mylan to "squeeze out" any remaining Perrigo shareholders by forcing them to compulsorily sell their shares at the same price offered to tendering shareholders. Accordingly, Mylan would obtain 100% control of Perrigo if 80% or more of Perrigo's outstanding ordinary shares tendered into the offer. The Rule 2.5 Announcement disclosed that Mylan might decide to lower the Acceptance Condition. On April 29, Mylan raised its offer to $75 in cash and 2.3 Mylan shares per Perrigo share.

On August 13, 2015, Mylan announced that it had decided to lower the Acceptance Condition from 80% to any amount in excess of 50% of ordinary Perrigo shares. Shortly thereafter, Mylan held an extraordinary general meeting, at which its shareholders voted in favor of Mylan proceeding with the offer. Mylan officially commenced its tender offer to Perrigo shareholders on September 14, and the offer is currently set to expire on November 13, 2015.

3

Perrigo commenced this action on September 17, 2015, alleging that certain public statements made by Mylan and its leadership, including Executive Chairman Robert Coury ("Coury"), in connection with the tender offer are false and misleading in violation of Section 14(e) of the Exchange Act.  Perrigo now moves the Court to enjoin Mylan from closing the tender offer until a reasonable number of days after Mylan issues corrective disclosures to Perrigo shareholders.  On September 22, Mylan filed its counterclaims alleging that certain statements made by Perrigo and Perrigo's CEO and Chairman Joseph Papa ("Papa") in connection with Mylan's offer violated Section 14(e).  Mylan moves for an order directing Perrigo to provide corrective disclosures to Perrigo shareholders and enjoining Perrigo from making further false or misleading statements.

The principal dispute in this case relates to statements made by Mylan in its disclosures regarding its estimation of the operational synergies achievable in this proposed transaction. Perrigo challenges certain statements made by Mylan related to that estimate both prior to and after the reduction of the Acceptance Condition, and Mylan responds by challenging certain Perrigo statements related to the same estimate.  Perrigo also challenges Mylan's statements related to Mylan's intent to cause Perrigo to delist Perrigo shares from all public stock exchanges on which they trade after consummation of the transaction.  Mylan's

remaining counterclaims relate to Perrigo's statements concerning the views of Mylan's largest shareholder, Abbott Laboratories (or "Abbott"); Perrigo's statements concerning the "dilutive" nature of the offer; and Perrigo's statements concerning the size of the offer premium.  In addressing the parties' claims below, we set forth the facts relevant to each claim.

## DISCUSSION

I.   Preliminary Injunction Standard

A party seeking a preliminary injunction must ordinarily establish:  "(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest."  New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation marks omitted).  However, the movant must meet a "higher standard where: (i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits."  Tom Doherty Associates, Inc. v. Saban Entm't, Inc., 60 F.3d 27, 33-34 (2d Cir. 1995).  If either condition is met, in addition to

5

showing that the preliminary injunction is in the public interest, the movant must demonstrate a "'clear' or 'substantial' likelihood of success on the merits," Actavis, 787 F.3d at 650 (quoting Beal v. Stern, 184 F.3d 117, 123 (2d Cir. 1999)), and "make a 'strong showing' of irreparable harm," Actavis, 787 F.3d at 650 (quoting Doe v. N.Y. Univ., 666 F.2d 761, 773 (2d Cir. 1981)).

Mylan argues that the Court should apply the higher standard here, because requiring a party to issue a disclosure necessarily alters the status quo and, alternatively, because enjoining the tender offer until Mylan issues corrective disclosures would provide Perrigo with substantially all of the relief it seeks. Perrigo responds that a preliminary injunction would not change the status quo but would merely "prohibit[] [Mylan] from consummating a tender offer on the basis of false and misleading securities filings," and, even if it were so enjoined, Mylan could ultimately prevail at trial and renew its offer. Reply Memorandum of Law in Support of Plaintiff Perrigo Company PLC's Motion for Preliminary Injunction ("Perrigo Reply") at 2-3.

While Mylan's position has linguistic and logical appeal, we nevertheless conclude that we are constrained by Second Circuit precedent to apply the ordinary standard. In Sonesta International Hotels Corp. v. Wellington Associates, the Court, although without referencing the heightened standard, applied the ordinary standard "in determining whether, at the instance of a target corporation,

a preliminary injunction should be issued against the continuation of a proposed tender offer when it is claimed that the offer and supporting materials . . . fail to adequately disclose material information necessary to make the statements contained in the offer not misleading."  483 F.2d 247, 250 (2d Cir. 1973); see also  E.ON AG v. Acciona, S.A., No. 06 CIV. 8720 (DLC), 2007 WL 316874, at *7 (S.D.N.Y. Feb. 5, 2007) (citing Sonesta and applying ordinary standard to motion for preliminary injunction requiring corrective disclosures in tender offer context).

However, our reading of Sonesta indicates that even under the ordinary standard, the movant's disclosure claims must be subjected to considerable scrutiny.  In applying the ordinary standard in that case, the Court noted that "preliminary injunctive relief is a particularly useful remedy for prevention of probable violations of the disclosure requirements of the [Williams] Act," Sonesta, 483 F.2d at 250 (emphasis added), and in "the normal situation, when it appears likely that the offer may contain materially misleading statements or omissions as made, the interest of the shareholders and of the public in full disclosure of relevant circumstances renders preliminary injunctive relief an appropriate method of remedying the deficiencies in disclosure before the offer is consummated," id. at 250-51 (emphasis added). This language suggests to us that courts should be wary of preliminarily enjoining tender offers based solely on surmise as

7

to what evidence could be developed through continued litigation.

As the Second Circuit stated in a later decision:

> In recognition of Congress' desire in enacting the Williams Act to avoid favoring either existing corporate management or outsiders seeking control through tender offers . . . the role of the courts in construing and applying the Act must likewise be one of strict neutrality.  Although we should not hesitate to enforce the Act's disclosure provisions through appropriate relief, we must also guard against improvident or precipitous use of remedies that may have the effect of favoring one side or the other in a takeover battle when allegations of violation of the Act, often made in the heat of the contest, may not be substantiated.  In this context the preliminary injunction, which is one of the most drastic tools in the arsenal of judicial remedies, . . . must be used with great care, lest the forces of the free market place, which in the end should determine the merits of takeover disputes, are nullified.

Hanson Trust PLC v. SCM Corp., 774 F.2d 47, 60 (2d Cir. 1985).

## II.   The Merits

### A.   Section 14(e) of the Securities Exchange Act of 1934

Section 14(e), originally added to the Exchange Act as

part of the Williams Act of 1968, provides in relevant part:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

15 U.S.C. § 78n(e).   Section 14(e) is a "'broad antifraud

prohibition[]' . . . modeled on the antifraud provisions of § 10(b)

8

of the [Exchange] Act and Rule 10b–5, 17 CFR § 240.10b–5 (1984)." Schreiber v. Burlington N., Inc., 472 U.S. 1, 10 (1985) (quoting Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 24 (1977)).

"The probability of success on the merits in any application for injunctive relief" based on a claimed violation of Section 14(e) "turns greatly upon whether the plaintiff has shown that the tender offer under attack has misstated or omitted material facts." Sonesta, 483 F.2d at 251 (emphasis in original).[3]  "For a misstatement or omission to qualify as material, 'there must be a substantial likelihood that' a complete and truthful disclosure 'would have been viewed by a reasonable investor as having significantly altered the 'total mix' of information made available.'"  New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC, 709 F.3d 109, 126 (2d Cir. 2013) (alteration omitted) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231–32 (1988)).  Accordingly, our inquiry is not aimed at determining whether "isolated statements within a document were true," but rather "whether defendants' representations or omissions, considered together and in context, would affect the total mix of

---

[3] The parties dispute whether scienter is a required element of a claim under Section 14(e) for injunctive relief.  The parties give minimal attention to this issue in their briefing, and we conclude that we need not decide whether scienter is a required element to resolve the present motions.  We note that Section 14(e) is modeled after Section 10(b) and Rule 10b–5, and the Supreme Court has said that "scienter is an element of a violation of § 10(b) and Rule 10b–5, regardless of the identity of the plaintiff or the nature of the relief sought." Aaron v. Sec. & Exch. Comm'n, 446 U.S. 680, 691 (1980).

information and thereby mislead a reasonable investor regarding the nature of the securities offered." Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002).

In considering the parties' claims pursuant to Section 14(e), we must keep in mind the purpose of the Williams Act. Congress adopted the Williams Act "in response to the growing use of cash tender offers as a means for achieving corporate takeovers," a device "which . . . removed a substantial number of corporate control contests from the reach of existing disclosure requirements of the federal securities laws." Chris-Craft Indus., 430 U.S. at 22. Recognizing that shareholders of a company that is the target of a takeover bid are "required to make an investment decision and to do so within a short period of time in response to a tender offer," Congress sought to increase protection for such shareholders through "full and fair disclosure." Macfadden Holdings, Inc. v. JB Acquisition Corp., 802 F.2d 62, 66 (2d Cir. 1986). In doing so, however, Congress did not "intend[] to remove all pressure or uncertainty from this inherently volatile market situation or to interfere with the forces of the free marketplace"; rather, "[t]he function of the Williams Act was to place pertinent information before the shareholders of the target company and then to allow the shareholders to decide for themselves." Id.; see also Elec. Specialty Co. v. Int'l Controls Corp., 409 F.2d 937, 948 (2d Cir. 1969) (Friendly, J.) ("Congress intended to assure

10

basic honesty and fair dealing, not to impose an unrealistic requirement of laboratory conditions that might make the new statute a potent tool for incumbent management to protect its own interests against the desires and welfare of the stockholders.").

### 1. Mylan's Statements Concerning Synergies Prior to Reduction of the Acceptance Condition

In its April 24 Rule 2.5 Announcement, Mylan stated that it "expects the combination" of Mylan and Perrigo "will result in at least US$800 million of annual pre-tax operational synergies by the end of year four following the consummation of the offer," and that this "synergy estimate was prepared using a sound process and was independently reported on by the Irish firm of PricewaterhouseCoopers and Goldman Sachs International in accordance with the requirements of the Irish Takeover Rules." Wilson Decl., Ex. G at 1. Perrigo argues that these statements are false because Mylan did not actually conduct a sound process in devising its estimate, asserting that the evidence shows that Mylan "deceived" the accounting firm of PricewaterhouseCoopers ("PwC") "by rushing to inflate its internal synergies estimate before sharing it once it learned that PwC would haircut the estimate it received." Memorandum of Law in Support of Plaintiff Perrigo Company PLC's Motion for a Preliminary Injunction ("Perrigo Mem.") at 13. The question of whether Perrigo has

11

demonstrated enough to warrant injunctive relief on this claim is bound up in the facts surrounding Mylan's internal development of a synergies estimate, which we set forth here to the extent pertinent.

As early as February 2015, members of Mylan's management team and their financial advisors at Goldman Sachs were discussing the amount of synergies to be used in the analysis of a potential acquisition of Perrigo, with emails indicating preliminary use of $650 million phased in over three years.  Sheehan Dep. at 59-60; Wilson Decl., Ex. R.  According to Mylan CFO John Sheehan, at that point Mylan was "taking a more conservative view with respect to the synergies number" because it had not yet "done significant work surrounding the synergies" it could achieve.  Sheehan Dep. at 60.  Early March pro forma profit and loss statements from Goldman Sachs assumed $800 million and $1 billion in synergies.  See Goldstein Decl., Ex. 40 at 7-8.

The record indicates that Mylan's work on the synergies numbers had ramped up by the first few days of April at the latest. April 1 and 4 "draft" "discussion materials" on the Perrigo acquisition sent to Mylan by its Goldman Sachs advisors and discussed in Mylan internal emails assumed $800 million in gross and $750 million in net synergies, respectively.  See Wilson Decl., Ex. O at 9; Ex. P at 3-4.  According to Sheehan, in early April Mylan's head of global business development Andrew Cuneo ("Cuneo")

12

and head of operations finance Paul Campbell ("Campbell") had been directed "to engage our operational leaders, commercial, manufacturing, supply chain, R&D, and functional leaders as to their estimates of opportunities for garnering synergies from the combined Mylan Perrigo cost structure or commercial platform[,] [a]nd . . . as they were doing that work, the amount of synergies were . . . being refined."  Sheehan Dep. at 94-95.

On April 2, Cuneo sent Mylan CEO Heather Bresch ("Bresch") the "draft preliminary synergy analysis requested," which estimated $800 million in gross synergies and $750 million in net synergies by year four following consummation of the deal.  Wilson Decl., Ex. S.   Bresch responded, "Great starting point!!!" Atkinson Decl., Ex. 65.   Bresch discussed the synergies analysis with Coury at some point between April 2 and April 6, when Mylan made its private nonbinding proposal to Perrigo.

Under the Irish Takeover Rules, an offeror issuing a statement including an estimate of the anticipated financial effects of a takeover must consult the Irish Takeover Panel (the "Takeover Panel" or "Panel") in advance and, unless the Panel consents otherwise, include in the statement, inter alia, "reports by financial advisers and auditors or . . . consultant accountants that the estimate has been made with due care and consideration." Rule 19.3(b)(ii) of the Irish Takeover Panel Act, 1997, Takeover Rules, 2013.  Accordingly, on April 8, Mylan was notified that the

13

Takeover Panel had approved PwC to review Mylan's synergy benefits in connection with the Perrigo offer.  PwC Partner Colin Wittmer ("Wittmer") and Sheehan spoke on the phone that day and, according to Sheehan, had a "general" discussion regarding the "requirements for an accountant reporting on a synergy number" under Irish law, PwC's methods, and the type of report PwC issued.  Sheehan Dep. at 36-39.  A notification for a "Synergies Call" organized by Mylan President and Executive Director Rajiv Malik ("Malik") for the next morning at 11:00 AM was circulated that evening to Sheehan, Cuneo, and others.  Wilson Decl., Ex. U.

On April 9, at 11:31 AM, Cuneo emailed Malik and Campbell another preliminary worksheet, which contained the same estimates as the April 2 worksheet sent to Bresch.  Mylan Bench Book, Ex. 2. At 1:17 PM, a "draft schedule detailing prelim synergy estimates" was circulated to Malik, Sheehan, Cuneo, Campbell and a few other Mylan employees.  Goldstein Decl., Ex. 66 at MYL00040867.  This "Preliminary Synergy Analysis" exhibited higher estimates than the April 2 analysis in most categories of synergies, and projected $1.05 billion in both gross and net synergies.  Id. at MYL00040866. Sheehan did not recall any discussion regarding synergies on that date and did not believe that he looked at further documentation supporting the estimates; he testified that his subordinates Campbell and Cuneo would have been responsible for making the decisions to increase the underlying numbers as they had been

14

speaking with various managers within Mylan and refining their analysis to reflect those discussions.   Sheehan Dep. at 99-103. At 2:24 PM, Wittmer sent Sheehan a sample report, which analyzed the synergies estimate of a different company, codenamed "Alpha." Goldstein Decl., Ex. 67.   The sample report stated that Alpha's identification of "synergies of $1,276mm, which are $426m greater than the $XXXm referred to in the 2.5 Announcement[,] provides headroom of 33% (before any risk weightings) against the execution risk in relation to the implementation of the synergies."   Id. at 7.

At least three more "Preliminary Synergy Analysis" worksheets were circulated internally at Mylan in the next few days.   Each worksheet made changes to certain estimates in the previous worksheet, with the progression reflecting downward and upward revisions.   Compare Goldstein Decl., Ex. 68 (worksheet circulated April 9 at 7:51 PM listing reduced synergies in various categories of synergies and reduced gross and net synergies as compared to earlier April 9 worksheet), with Goldstein Decl., Ex. 69 (worksheet circulated April 10 listing increased cost-of-goods-sold savings, gross synergies and net synergies), with Wilson Decl., Ex. X (worksheet submitted to PwC on April 13 listing slightly increased R&D synergies).   The final worksheet was sent to PwC on April 13; it projected gross synergies of $1.017 billion and net synergies of $917 million.   Id.

15

On April 19, PwC issued its private report to Mylan, in which PwC agreed to provide, in conjunction with the Rule 2.5 Announcement, its opinion that Mylan's estimation of more than $800 million of pre-tax operational synergies following the combination was made with "due care and consideration."  Wilson Decl., Ex. Y at 3, 7.  The report reviewed "each of the initiatives" provided by Mylan management, "assessed whether the initiative is a synergy, the quality of the evidence that underpins the assumptions and the associated execution risk," and ultimately concluded that $868 million of the $1.017 billion of Mylan's estimated synergies were "substantially supported" or had "support in principle, subject to a more detailed implementation plan being finalised."  Id. at 9.  According to PwC, "[t]he identification of synergies of $1,017m, which are $217m greater than the $800m referred to in the 2.5 Announcement, provides headroom of 21% (before any risk weightings) against the execution risk in relation to the implementation of the synergies."  Id.

In its moving papers, Perrigo contends that the evidence demonstrates that Mylan had finalized a synergies estimate of $800 million prior to Sheehan's phone call with PwC's Wittmer on April 8, and given that PwC's sample report demonstrates that PwC had applied "haircuts" to projected synergies in precedent transactions, it must be inferred that Wittmer and Sheehan discussed such a haircut on the phone and that Mylan manufactured

16

an inflated synergies estimate in the ensuing days.  We cannot reasonably draw the same inference from the record.

Perrigo does not challenge either the actual calculations underlying the estimates that Mylan provided to PwC or the due diligence that PwC conducted in reviewing Mylan's submitted estimates and finding them to be in large part supported by evidence.  In its report, PwC explained that its review took place over a seven day period from April 10 through 17; PwC employees visited Mylan's corporate office, obtained information from and held discussions with eleven members of Mylan's senior management, "[r]eview[ed] . . . information and analysis provided by each functional team sponsor head responsible for the relevant category in the synergy case," and  "[c]onsider[ed] . . . the cost profile of  [Perrigo]  and  other  publicly  available  information  on [Perrigo]."  Wilson Decl., Ex. Y at 4.  PwC applied a risk-weighted analysis to the projections that Mylan had provided, and concluded that  Mylan  "management  have  made  a  reasonably  conservative estimate of the quantum and timing of the synergies given the relative lack of available information on [Perrigo]."  Id. at 7; see  id.  at  9  ("Save  for  known  duplicate  areas,  management quantified the synergies within the $1,017m synergy case to include a reasonable level of built-in conservatism . . . .").  Around the same time that Mylan submitted its final synergies worksheet for PwC's review, Wittmer emailed Mylan President Malik to say that he

17

had "just finished with [Cuneo] and [Campbell]," and that he was "very happy with the level of thought and detail that Mylan has provided on the synergies." Supp. Atkinson Decl., Ex. 76. PwC's determination that Mylan's submitted estimate of $1.017 billion was reasonably conservative substantially undermines the inference that Mylan inflated it without basis.[4]

Our conclusion is bolstered by evidence indicating that Mylan's internal estimate of $800 million in gross synergies does not appear to reflect a final determination. While in the days leading up to Mylan's nonbinding proposal, Mylan employees were using Goldman Sachs models that assumed $800 million in gross synergies, Sheehan testified that Mylan itself was responsible for preparing the analyses supporting the synergies figure, see Sheehan Dep. at 27, and aspects of the synergies assumption in the models were still being revised at that time, see Wilson Decl., Ex. M (Sheehan April 2 email noting that Cuneo instructed Goldman Sachs banker "to assume realization of synergies in the model over 4 years"); Ex. P (April 3 email from Goldman Sachs referencing accretion/dilution analysis that "reflects the latest synergy assumptions" from Mylan and noting that the numbers in the model were "still moving").

---

[4]  In addition, as Mylan notes, Perrigo's failure to adduce either evidence from PwC suggesting that it could have been manipulated by Mylan prior to issuing its report or evidence from an expert indicating that PwC's diligence was lacking raises the inference that PwC's review was not without teeth.

Indeed, the internal Mylan emails and "[p]reliminary" synergies worksheets in the record suggest that the analysis underlying the $800 million estimate may have been, as Bresch wrote, a "starting point," Goldstein Decl., Ex. 65, and that the work supporting Mylan's disclosed estimates figure had not been completed in its entirety prior to Mylan's April 13 submission to PwC.  For example, the worksheet circulated on April 10 included subcategories of "vertical integration" and "logistics" synergies that had not been separately broken out in earlier worksheets, Goldstein Decl., Ex. 69 at 4, and the internal email to which the that worksheet was attached makes clear that review of the analysis therein was ongoing, see Goldstein Decl., Ex. 69 (email from Campbell concerning "updated analysis," where Campbell states that Mylan's info had been updated to include the "2015 budget numbers," and notes that certain "draft[s]" for different categories of synergies had been "updated" and other drafts were "in the final stages of review").  Further, the worksheet submitted to PwC on April 13 included a substantial amount of supporting documentation containing breakdowns of expected synergies in numerous subcategories within the broader categories of synergies, such as a country-by-country spreadsheet for expected sales force reduction and itemizations of estimated savings for components within the subcategories of "plant rationalization," "logistics," and "vertical integration"; this supporting documentation was in

19

large part missing from prior worksheets.  <u>Compare</u> Mylan N.V. Bench Book, Ex. 2 at 5-7 (April 9 worksheet reflecting same projections as April 2 worksheet), <u>with</u> Goldstein Decl., Ex. 70 at 8, 9-11, 14-25 (worksheet submitted to PwC on April 13 containing additional supporting documentation).  This documentary evidence is consistent with Sheehan's testimony that much of the "significant work" in determining a synergies estimate to disclose occurred in the "first half of April," and that the "full analyses" had not been completed before PwC was approved to do its review.  Sheehan Dep. at 59-60.

In sum, the record supports Mylan's position that its process in preparing the synergies estimate submitted to PwC was "sound," and Perrigo's claim is too dependent on conjecture to warrant a preliminary injunction.

### 2. Mylan's Statements Concerning Synergies After Reduction of the Acceptance Condition

On August 13, 2015, Mylan announced that it had decided to lower the Acceptance Condition from 80% of Perrigo's outstanding shares to any amount in excess of 50%.  Under Irish law, if

> Mylan acquires more than 50% and less than 80% of the shareholding in Perrigo, and then elects to deal with Perrigo as a controlled subsidiary, including by electing a new board of directors and controlling the day to day management of the company, the overriding obligation of any directors which are elected at Mylan's instance to Perrigo's board will be, and will remain, to conduct the company's affairs in good faith

20

> in the interests of Perrigo and its shareholders as a whole, including minority shareholders.

Declaration of Michael McDowell SC ("McDowell Decl.") ¶ 7.3. Accordingly, if it receives between 50% and 80% of Perrigo's shares in the tender offer, Mylan would be able to elect its directors to Perrigo's board and operate Perrigo as a controlled subsidiary, but the Perrigo board would still owe duties to act in the interests of Perrigo and its shareholders, and arrangements between the two companies necessary to implement operational synergies would need to be on an arm's-length basis.

Prior to reducing the Acceptance Condition in August, Mylan did not replicate the "ground up" analysis that it had previously completed in April to account for the additional risks posed by the controlled-subsidiary scenario. See Coury Dep. at 39; Sheehan Dep. at 155. Instead, Coury testified that he had discussed with the Mylan board of directors and his legal advisors the implications of failing to reach the 80% threshold on Mylan's operational control of Perrigo and the added requirement of arm's-length dealing. See Coury Dep. at 33-35. Further, Coury testified that Mylan's board had confidence that it could still meet Mylan's original projections despite not owning all of Perrigo because of Mylan's prior experience operating a publicly traded Indian company named Matrix as a controlled subsidiary. See id. at 101-102.

21

Sheehan testified that discussions regarding the effect of lowering the Acceptance Condition were had among the "leadership team," Sheehan Dep. at 136, and that those discussions covered the need for "arm's length documentation and agreements between Mylan and Perrigo" in such a situation, but that Mylan had experience putting together similar arrangements in conjunction with its acquisition of a controlling interest in Matrix, id. at 138-39. Both Coury and Sheehan conceded that Mylan had not conducted an analysis of how such arm's-length agreements would work as applied to any of the specific categories of synergies Mylan had identified as achievable.  See id. at 168-69; Coury Dep. at 91.

On September 14, Mylan filed its Schedule TO directed at Perrigo shareholders.  In a section of the Schedule TO titled "***Restructuring of Perrigo and Synergies from the Combination***," Mylan disclosed that if it receives between 50% and 80% of Perrigo, it "intends to operate Perrigo as a controlled subsidiary and would effectively control Perrigo's operations on a day-to-day basis." Wilson Decl., Ex. JJ at 76.  The Schedule TO repeatedly warned Perrigo shareholders of the risk that this controlled-subsidiary scenario would result in delayed or reduced achievement of the operational synergies anticipated by Mylan.  Thus, the same section of the Schedule TO disclosed that

> [t]he arrangements necessary to implement the operational synergies between Mylan and Perrigo would need to be in this case on an arms-length basis, and this additional requirement

22

may require Mylan to pursue different steps to realize operational synergies than it would pursue if it owned 100% of Perrigo's ordinary shares and could potentially result in a delay in realizing the anticipated operational synergies.

Id. at 77.  This section also noted that "[s]ince Mylan has not had due diligence access to Perrigo or its business or management, Mylan has not yet formulated detailed plans for realizing operational synergies and at this time cannot determine with more specificity the effect of not acquiring 100% of Perrigo's ordinary shares on its synergy plans."  Id.

Under the heading "**FAILURE TO ACQUIRE 100% OF THE PERRIGO ORDINARY SHARES MAY AFFECT OUR ABILITY TO COMPLETE ANY POST-CLOSING RESTRUCTURING OF PERRIGO AND ITS SUBSIDIARIES. THIS COULD REDUCE OR DELAY THE COST SAVINGS OR REVENUE BENEFITS TO MYLAN,**" Mylan provided nearly identical cautionary language.  Id. at 28-29.  That section also provided that "if we own less than 100% of Perrigo after completion of the offer, our resulting combined structure might be less efficient and we may not be able to carry out joint cash pooling or other intra-company transactions with Perrigo and its subsidiaries on favorable terms or at all.  This may adversely affect our ability to achieve the expected amount of operational and other synergies after the offer is completed."  Id. at 29.

Despite this cautionary language, Mylan disclosed its belief that, even if it operated Perrigo as a controlled subsidiary, it would still "have the ability to cause Perrigo to take the actions

23

required to realize the anticipated operational synergies" of at least $800 million.  Id. at 77.  Specifically, Mylan stated that it had

> carefully reviewed Perrigo's publicly available information in connection with estimating the annual pre-tax operational synergies from the offer and believes based on its prior experience integrating other acquired companies, including Mylan Laboratories Limited [Matrix], which Mylan acquired less than 100% of in 2007 and operated as a controlled subsidiary until 2015, that it can successfully manage the additional risks described above and the combination can realize the anticipated operational synergies from the offer. Accordingly, the possibility of operating Perrigo as a controlled subsidiary does not change any of Mylan's key assumptions regarding the categories of operational synergies available or the potential opportunity within each category, and Mylan continues to believe that the offer will result in at least $800 million of annual pre-tax operational synergies by the end of year four following consummation of the offer.

Id.

Perrigo argues that the above statements reaffirming the achievability of Mylan's synergies estimate even in a controlled-subsidiary situation are misleading because they lack a reasonable basis.  Perrigo contends that because the record demonstrates that that Mylan did not conduct any sort of meaningful analysis to determine that at least $800 million synergies were achievable despite the differences inherent in such a situation, and, because such an analysis would necessarily have concluded that the opportunity within each category of synergies would be diminished, Mylan's statements are misleading under the Supreme Court's decision in Omnicare, Inc. v. Laborers District Council

24

Construction Industry Pension Fund, --- U.S. ----, 135 S.Ct. 1318 (2015).[5]

"[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor:  The inquiry (like the one into materiality) is objective."  Omnicare, 135 S.Ct. at 1327.  An opinion may be misleading for purposes of the securities laws in two different ways.  First, an opinion is misleading if the "statement was both objectively false and disbelieved by the defendant at the time it was expressed." Fait v. Regions Fin. Corp., 655 F.3d 105, 110 (2d Cir. 2011).  Perrigo does not argue that Mylan's statements were disbelieved at the time they were issued.

The second manner in which an opinion may be misleading arises when a "reasonable investor . . . understand[s] an opinion statement to convey facts about how the speaker has formed the

---

[5] While the Supreme Court's decision in Omnicare dealt with claims under Section 11 of the Securities Act of 1933, its reasoning has been applied to claims brought under Section 10(b) of the Exchange Act, and Mylan does not appear to contest its applicability to claims under Section 14(e), which is modeled on Section 10(b).  See In re Velti PLC Sec. Litig., No. 13-CV-03889-WHO, 2015 WL 5736589, at *33 (N.D. Cal. Oct. 1, 2015) ("Although Omnicare concerned statements of opinion under Section 11, several courts to consider such statements under Section 10(b) since Omnicare have applied the Omnicare analysis."); In re Lehman Bros. Sec. & Erisa Litig., No. 09-MD-2017 (LAK), 2015 WL 5514692, at *5 n.48 (S.D.N.Y. Sept. 18, 2015) (Omnicare's "reasoning applies with equal force to other provisions of the federal securities laws, including, as relevant to this case, Section 10(b) and Rule 10b-5, which uses very similar language" to Section 11).

opinion—or, otherwise put, about the speaker's basis for holding that view," and "the real facts are otherwise, but not provided." Omnicare, 135 S. Ct. at 1328.  When considering "financial statements filed with the SEC, reasonable investors 'do not, and are not right to, expect opinions contained in those statements to reflect baseless, off-the-cuff judgments.'"  In re Lehman Bros. Sec. & Erisa Litig., No. 09-MD-2017 (LAK), 2015 WL 5514692, at *6 (S.D.N.Y. Sept. 18, 2015) (quoting Omnicare, 135 S. Ct. at 1330). Instead, the investor "expects not just that the [speaker] believes the opinion (however irrationally), but that it fairly aligns with the information in the [speaker's] possession at the time." Omnicare, 135 S. Ct. at 1329.

However, in determining whether an opinion within a disclosure document is misleading, we assume that an investor "takes into account the customs and practices of the relevant industry," and "reads each statement within such a document, whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information." Id. at 1330.  Thus, in the context of forward-looking statements, "the presence of cautionary language is a relevant factor to be considered in deciding whether a reasonable investor could have been misled." Halperin, 295 F.3d at 359.  At bottom, we must determine whether the disclosure document at issue "omits material facts about the [speaker's] inquiry into or

26

knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the [document] itself." Omnicare, 135 S. Ct. at 1318.

Given the foregoing principles, Perrigo's claim aimed at the statements in Mylan's Schedule TO is without merit. The argument that Mylan's statements reaffirming its belief in the achievability of at least $800 million in synergies are misleadingly incomplete fails because it does not consider those "statement[s] fairly and in context." Id. at 1332.

As a general matter, Perrigo largely ignores the abundant cautionary language discussed above. That language is specifically tailored to the risks related to the effect of not acquiring all of Perrigo on Mylan's synergies estimate: the arm's-length arrangements necessary in such a situation may "require [Mylan] to pursue different steps to realize operational synergies," the "resulting combined structure might be less efficient," Mylan may not be "be able to carry out . . . intra-company transactions with Perrigo and its subsidiaries on favorable terms or at all," and the achievement of operational synergies could be delayed or adversely affected. Wilson Decl., Ex. JJ at 29.

While Perrigo contends that the Schedule TO is still misleading because it omits the facts that Mylan did not reengage PwC after reducing the Acceptance Condition and failed to conduct

27

a new ground-up analysis to "quantify the achievable synergies in the controlled-subsidiary scenario," Perrigo Reply at 6, we do not read Mylan's disclosure to misleadingly suggest that Mylan had done either one of those things.  The Schedule TO disclosed the only bases for Mylan's continued belief in the synergies estimate: Mylan had "carefully reviewed Perrigo's publicly available information in connection with estimating the annual pre-tax operational synergies from the offer" and "believe[d] based on its prior experience integrating other acquired companies, including [Matrix], which Mylan . . . operated as a controlled subsidiary until 2015, that it can successfully manage the additional risks" if it failed to acquire 100% of Perrigo.  Wilson Decl., Ex. JJ at 77.  These statements accurately represent the grounds for Mylan's opinion:  Mylan's estimate of $1,017 billion in April was "based on [Perrigo] public information," Wilson Decl., Ex. Y at 9, and before reducing the Acceptance Condition, Mylan's leaders had discussions wherein they determined that, based on their experience operating Matrix, the risks to achieving the disclosed synergies number would be successfully managed.

In light of the disclosed bases for Mylan's belief, Perrigo fails to adduce any evidence as to why a reasonable investor would find that omitting the facts that Mylan did not reengage PwC or redo its ground-up analysis rendered Mylan's statements misleading.  The statements at issue do not refer to PwC's original

28

opinion--an opinion required under Irish, not United States, law--and Perrigo does not contend that Mylan was required to reengage PwC to revise its opinion.   Moreover, it is not clear that reasonable investors would have expected Mylan to rerun an internal ground-up analysis.   There is no evidence in the record of any industry custom, practice or accepted valuation metric for either calculating synergies generally or, more importantly, recalibrating those calculations to account for the possibility of achieving an undetermined controlling position in a target company; counsel for Perrigo himself noted the absence of a "well-known understanding of how to calculate synergies" in the latter scenario.   Oral Argument Transcript ("Oral Argument Tr.") at 56-57.[6]   In addition, while Perrigo faults Mylan for not conducting any analysis as to how arm's-length agreements would work in practice as to each of the functional areas where Mylan projected synergies, the Schedule TO did not imply that Mylan undertook such an analysis--to the contrary, it stated that "Mylan has not yet formulated detailed plans for realizing operational synergies and

---

[6] Perrigo argues that a reasonable investor would assume that Mylan reran its ground-up analysis because that was "the type of analysis favored by both Coury and Sheehan," citing to the deposition testimony of Coury and Sheehan explaining their method for projecting synergies in advance of the Rule 2.5 Announcement.   Perrigo Reply at 6.   This evidence of Mylan's "favored" method for projecting synergies in a full acquisition, procured in depositions in this action, says little about what kind of analysis a reasonable investor would have expected Mylan to do in the different circumstance of attempting to project synergies in a 50%-to-80% ownership situation.

at this time cannot determine with more specificity the effect of not acquiring 100% of Perrigo's ordinary shares on its synergy plans."  Wilson Decl., Ex. JJ at 77.

Perrigo also argues that Mylan's statements about Matrix are misleading, because Mylan did not disclose any expected synergies when it bought a controlling stake in Matrix in 2007, but predicted additional efficiencies when it announced a plan to acquire most of the remaining shares of Matrix in 2009.  However, Perrigo provides no evidence that Mylan did not actually realize synergies from operating Matrix as a controlled subsidiary.  The limited evidence in the record on this subject indicates that Mylan integrated Matrix with a company which it owned outright, Merck Generics, and both expected to achieve cost savings from that integration and successfully did so, see Mylan Bench Book, Ex. 25, at 3 (May 2007 Mylan press release announcing acquisition of Merck Generics and noting that Mylan had acquired "71.5% stake" in Matrix, that "[t]ogether Mylan and Merck Generics will benefit from significant savings driven by Matrix's low cost, high quality [active pharmaceutical ingredient] capacity," and that Mylan expected synergies to result "from vertical integration of Merck's [active pharmaceutical ingredient] supply by," inter alia, "leveraging the Matrix platform"); Wilson Decl., Ex. Y at 11 (PwC report noting that "[d]uring the integration of Matrix and Merck Generics, . . . . Mylan . . . drove synergy attainment that

30

doubled initial targets"). Moreover, while Mylan expected to achieve "additional integration and additional efficiencies" when it announced its acquisition of most of the remaining Matrix shares in 2009, Declaration of Daniel Fischel ("Fischel Decl.") ¶ 34, there is no indication in the record of the relative value of the efficiencies realized through that incremental purchase as compared to those realized through Mylan's original purchase of a controlling interest. Given that Mylan's synergies estimate is only a floor and its internal projections provided it some cushion, we cannot conclude that it was unreasonable for Mylan to rely on its Matrix experience to inform its opinion that at least $800 million in operational synergies could still be achieved if it did not acquire 100% of Perrigo.[7]

Relying on experts, the parties dispute the ability of Mylan to effectively achieve synergies as a controlling shareholder. However, the ultimate conclusion of Perrigo's expert Daniel Fischel that Mylan will "achieve a lower amount of synergies if it acquires less than 100 percent of Perrigo," Fischel Decl. ¶ 15, does not change the Court's conclusion that Mylan met Omnicare's requirements. Our reading of Fischel's expert report leads us to

---

[7]  Perrigo also argues that Mylan's reliance on Matrix is misleading because Matrix was a much smaller target than Perrigo. However, Perrigo's own expert only states that "[i]t is unclear" if Mylan "would be able to achieve similar results in the case of a far larger company like Perrigo." Fischel Decl. ¶ 40. Perrigo thus does not provide compelling evidence that Mylan's failure to disclose Matrix's relative size constitutes a material omission.

believe that at least some reduction in operational synergies should be anticipated. Fischel opines that Mylan will be unable to "significantly eliminate" general and administrative costs at Perrigo, and that the transaction costs of negotiating agreements to achieve research and development and operational savings "may" prevent Perrigo and Mylan from reaching such agreements and will themselves reduce savings. Fischel Decl. ¶¶ 27, 29-30, 31-32. However, Mylan's Schedule TO did not state that the same level of synergies would be achieved even if Mylan does not acquire 100% of Perrigo, and Mylan disclosed that such an outcome could adversely affect realized synergies. Mylan's internal estimates projected more than $800 million in synergies, and Fischel's report does not provide any insight as to the key question of the magnitude of any diminishment in synergies if Mylan cannot acquire all of Perrigo. Accordingly, Fischel's report does not help answer the question of whether any such reduction would necessarily be so great that Mylan's opinion reaffirming its estimate did not "fairly align[] with the information in [its] possession." Omnicare, 135 S. Ct. at 1329.

Perrigo makes two additional arguments related to Mylan's disclosure following the reduction of the Acceptance Condition. First, Perrigo argues that Mylan's statement that "the possibility of operating Perrigo as a controlled subsidiary does not change any of Mylan's key assumptions regarding the categories of

32

operational synergies available or the potential opportunity within each category" is belied by Mylan's earlier disclosures. In its April 24 Rule 2.5 Announcement, Mylan did state that "[t]he Synergy Statement should . . . be read in conjunction with the key assumptions underlying such estimates," Wilson Decl., Ex. G at 11, and elsewhere disclosed that "[w]hen evaluating the potential annual pre-tax operational synergies, Mylan assumed," inter alia, that "the Offer will be consummated and, following the consummation of the Offer, Mylan will acquire compulsorily any Perrigo Shares not acquired or agreed to be acquired pursuant to the Offer or otherwise," id. at app. II-1. Mylan's statement in its Schedule TO and the above statements in the Rule 2.5 Announcement may arguably be inconsistent if one infers that all assumptions listed as supporting the synergies estimate were "key" assumptions. However, we do not believe that any inconsistency would "affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." Halperin, 295 F.3d at 357. Mylan's Schedule TO, the later disclosure document, makes clear that Mylan does not believe that full ownership of Perrigo is a key assumption underlying its synergies estimate, and Mylan has disclosed the risk that failing to acquire all of Perrigo poses to its projected synergies.

Second, Perrigo challenges as misleading Mylan's statement in the Schedule TO that in a controlled-subsidiary situation,

"[s]ince Mylan would not have acquired (and paid for) 100% of the Perrigo ordinary shares, Mylan shareholders may not realize the full financial benefits of operational synergies from the combination as certain of these financial benefits may be shared by the minority shareholders of Perrigo."  Wilson Decl, Ex. JJ at 77.  Relying on cases that hold that "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired," Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004), Perrigo contends that Mylan's use of the word "may" is misleading because some financial benefit of any synergies created by the combination in a controlled-subsidiary situation will necessarily accrue to minority Perrigo shareholders.

This case is distinguishable from those involving the disclosure of a risk that a future event might occur by a defendant that knows that the risk has already transpired.  The statement at issue here involves the disclosure of an outcome itself predicated on an uncertain condition---that Mylan finds itself owning between 50% and 80% of Perrigo.  The Schedule TO uses the word "combination" to refer to both Mylan acquiring 100% control of Perrigo and Mylan acquiring less than 80% of Perrigo and operating it as a controlled subsidiary.  See Atkinson Decl., Ex. 3 at 4. We thus interpret the challenged statement above as standing for the undisputed proposition that the ultimate "combination" of Perrigo and Mylan, which can refer to either full ownership or a

34

majority stake held by Mylan, may not provide Mylan shareholders 100% of the full financial benefits of operational synergies, as in some circumstances they would have to share those benefits with the minority shareholders of Perrigo.[8]  Mylan may reasonably use conditional language to reflect the fact that Mylan simply cannot predict the parameters and detailed consequences of all the possible acquisition scenarios with certainty.[9]

### 3. Mylan's Delisting Statements

In its April 24 Rule 2.5 Announcement, Mylan disclosed that "[a]s soon as it is appropriate and possible to do so, . . . Mylan intends to apply for the cancellation of the listing and trading of Perrigo Shares on the NYSE and TASE.  Such cancellation of the listing and trading of Perrigo Shares is likely to reduce significantly the liquidity and marketability of any Perrigo Shares with respect to which the Offer has not been accepted." Atkinson Decl., Ex. 9 at 5.  On August 14, the day after Mylan

---

[8] Mylan concedes that if it "acquires less than 100% ownership of Perrigo, the anticipated synergies of at least $800 million will be fairly allocated between the two companies at arms-length."  Coury Decl. ¶ 8.

[9] Perrigo challenges for similar reasons a statement made by Coury on an investor call where he asserts that an outcome in which Mylan received 50.1% of Perrigo's shares would actually be more "financially accretive" to Mylan shareholders than a full acquisition because Mylan would have to issue fewer shares while still, Coury believes, generating at least $800 million of synergies.  Wilson Decl., Ex. TT at 11.  We do not read Coury's statement to suggest that Mylan shareholders would receive all of the financial benefits of ultimately realized synergies.

announced that it had lowered the Acceptance Condition for the offer, the SEC wrote to Mylan asking it to update its disclosures to provide notice that "[f]ollowing acquisition of less than 80% of Perrigo shares, any attempts by Mylan to de-list Perrigo shares may face shareholder challenges in the Irish courts on the basis that de-listing constitutes an 'oppressive action.'"  Goldstein Decl., Ex. 51 at 2.[10]

Mylan's Schedule TO disclosed that Mylan "currently intends to cause Perrigo to delist the Perrigo ordinary shares from the NYSE and TASE as soon after consummation of the offer as is practicable" and "[a]s a result of such delisting, Perrigo ordinary shares not tendered pursuant to the offer may become illiquid and may be of reduced value."  Wilson Decl., Ex. JJ at 28.  Mylan warned that "if Perrigo shareholders continue to hold Perrigo ordinary shares following consummation of the offer, Mylan and/or Perrigo could encounter legal challenges in the Irish courts from such minority shareholders in connection with delisting," "including allegations that such actions constitute oppressive actions under Irish law."  Id.

Perrigo contends that Mylan's statements concerning delisting are false and misleading.  If Perrigo becomes a controlled

---

[10] The SEC's request may have been prompted by Perrigo's July 20 letter to the SEC complaining of deficiencies in certain Mylan filings.  Goldstein Decl., Ex. 50 at 3.

subsidiary of Mylan, Perrigo's board of directors, even if elected by Mylan, would ultimately have to make the decision to delist. McDowell Decl. ¶ 7.3.   Perrigo argues that, because under Irish law those directors would have to act in the interest of all Perrigo shareholders, including any minority shareholders, delisting Perrigo's shares would be unlawful.   Moreover, Perrigo argues that because Mylan has never publicly articulated a reason for delisting Perrigo's shares and discovery has indicated that Mylan has not considered how it will persuade a future Perrigo board that such a decision could be made in keeping with its duties under Irish law, Mylan will not ultimately be able to delist Perrigo's shares in a controlled-subsidiary situation and the "threat" must be withdrawn.   Perrigo Mem. at 22-23.

Preliminarily, the Court cannot state with any reasonable level of certainty that delisting will not be "practicable" at some point "after the consummation of the offer," and thus that Mylan misrepresented its intent because it knew or recklessly disregarded that it could not follow through on that intent. <u>Cf.</u> <u>Hunt v. Alliance N. Am. Gov't Income Trust, Inc.</u>, 159 F.3d 723, 728 (2d Cir. 1998) (where disclosure could be read to mean that "Fund would attempt to hedge against currency risk by using [certain hedging] techniques," "alleging that the Fund managers knew (or recklessly disregarded) that these hedging techniques were not available . . . stated an actionable claim for

37

misrepresentation"). Both parties provide declarations from Irish law experts, each of whom confirms that the lawfulness of Perrigo's delisting would ultimately be a "question of fact." Declaration of Lyndon Mac Cann ("Mac Cann Decl.") ¶ 35; see McDowell Decl. ¶ 9.4 (Perrigo's expert opining that delisting would be "prima facie unlawful and liable to successful challenge, including restraint and compensation by shareholders adversely affected, if it appeared that it was not taken both (i) in good faith, and (ii) on reasonable grounds, in the separate interest of Perrigo and all of its members." (some emphases in original)). Accordingly, even though the Court's reading of the relevant authority provided by the experts suggests that a decision that "damage[s] the interests of one section of the shareholders in favour of another" may violate a director's duty under Irish law to act "in the interests of the company," Irish Press plc v. Ingersoll Irish Publications Limited [1993] (H. Ct.), McDowell Decl., Annex E at 63, we are reluctant to prejudge how a particular action would be treated under Irish law prior to the development of the relevant facts.

Moreover, it is also unclear whether an Irish court's future determination that Perrigo's board of directors "oppressed" minority shareholders would invalidate the delisting itself. See Companies Act 2014 Section 212(2), (3) (orders which an Irish court may make as a "Remedy in case of oppression" include "directing or prohibiting any act or cancelling or varying any transaction," an

order "for the purchase of the shares of any members of the company by other members of the company or by the company," and "the payment of compensation"); Mac Cann Decl. ¶ 76 (likely remedy in Mac Cann's opinion would be "an order directing that the shareholder be bought out for fair value (i.e., at the price their shares would have stood at but for the oppression / disregard of interests) or . . . damages in an amount equivalent to the diminution that they have suffered in the value of their shareholding."). Mylan may thus indeed be able to follow through on its announced intention to cause a delisting of Perrigo stock, even if it ultimately results in Mylan having to compensate shareholders who challenge the action. Mylan's disclosure that "Mylan and/or Perrigo could encounter legal challenges in the Irish courts from such minority shareholders in connection with delisting . . . including allegations that such actions constitute oppressive actions under Irish law," Wilson Decl., Ex. JJ at 28, sufficiently informs Perrigo shareholders of that risk.

However, Perrigo is correct that the record evidence indicates that Mylan leadership has not developed any specific plan for how it will persuade a future Perrigo board to delist. At his deposition, Coury testified that Mylan still "absolutely . . . intends to delist the Perrigo shares as soon as practically possible," but when asked how it would accomplish that, he responded, "until that independent decision is taken up at the

Perrigo board level there is nothing more I can tell you."  Coury Dep. at 145-46.  He refused to "speculate" as to business reasons to present to the future Perrigo board when he did not yet "understand the facts or circumstances" he would have to consider. Id. at 150.[11]  He had not "done the work yet" to develop a case to the future Perrigo board, id. at 162, and when asked "[h]ow do you know sitting here today that you will come to the conclusion that delisting is better for Perrigo than not delisting," Coury responded that it was "just my gut reaction about the experience I have had in the past, . . . and it's something that I have a stated intention, I simply want to make it clear to the Perrigo shareholder that this potential could exist and that this is my stated intention and I want to make sure they understand that in advance," id. at 164.

Sheehan was not asked any questions regarding the delisting of Perrigo shares at his deposition, but submitted a declaration where he stated that the reasons for delisting "would have to be specifically analyzed based on the particular circumstances that might exist at the time of the decision, taking account, for example, of the level of Mylan's ownership of Perrigo, the structure and governance processes of Perrigo's board, and the

---

[11] He did note that there would be benefits from "streamlining" certain costs, but admitted that he had not given enough thought to the issue to determine whether that amount would be "de minimis."  Coury Dep. at 152-53.

interests of Perrigo in light of then-existing market and competitive conditions." Sheehan Declaration ¶ 6. Sheehan asserted that precisely because "it is not possible to predict exactly what considerations the Perrigo board (or Mylan) would have to take into account" in the future, Mylan intends to cause delisting "'as soon as practicable' following consummation of the transaction—rather than on a specific date or at a specific percent ownership level." Id. Nonetheless, he shared general "considerations that have led Mylan to conclude that its current intention is to delist Perrigo shares as soon as practicable": "[E]liminat[ing]" the "needless costs and inefficiencies" of maintaining Perrigo's separate public listing in a situation where the primary benefits of being publicly listed—access to capital and the ability to use listed shares to acquire other companies— could be provided by Mylan through Mylan's own public listing. Id. ¶¶ 8-9. He did not, however, refer to the potential cost of reduced liquidity to Perrigo minority shareholders.

The question is whether this evidence suggesting that Mylan has yet to formulate specific plans concerning its intent to delist means Mylan is likely to have "omit[ted] to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." 15 U.S.C. § 78n(e). We conclude that it does not.

41

By noting that it "currently intends" to delist "as soon after consummation of the offer as is practicable," Wilson Decl., Ex. JJ at 28, Mylan sufficiently conveyed the inchoate nature of its plan. The effect of adding the "as is practicable" language was to demonstrate that Mylan had not yet determined when delisting would, if ever, be practicable.  Moreover, by stating that delisting could subject it to legal challenges from minority shareholders, Mylan disclosed that it could be found unlawful—the clear implication being that the issue of legality would weigh on any future decision by Mylan as to the "practicability" of the action.  Here, the "excluded fact" of a specific plan for executing an intent that is on its face a provisional decision does not show that Mylan "lacked the basis for making those statements that a reasonable investor would expect."  Omnicare, 135 S. Ct. at 1333.

### 4. Perrigo's Statements

Mylan brings counterclaims based on certain statements made by Perrigo and its Chairman Papa in connection with Mylan's tender offer.  Mylan contends that Perrigo has made false statements by (1) asserting that Mylan has said that it could obtain the exact same synergies regardless of whether it owns or merely controls Perrigo, (2) misrepresenting the views of Abbott concerning the offer, (3) stating that the offer would be dilutive to earnings per share (or "EPS") for Perrigo shareholders, and (4) misleading

Perrigo shareholders as to the offer premium.  None of Mylan's claims warrants a preliminary injunction.

**"Exact Same" Synergies:**  In its Schedule 14D-9 filed with the SEC on September 17, Perrigo stated that "the Perrigo Board believes that Mylan cannot achieve the same synergies on the same timeline if it closes the Offer and fails to reach the 80% threshold.  While Mylan would like shareholders to believe it can achieve the exact same synergies regardless of whether Perrigo is a 100%-owned subsidiary with no minority shareholders or a controlled subsidiary with minority shareholders, this is simply not credible, as evidenced by the assessments of numerous third-party observers."  Atkinson Decl., Ex. 4 at 13.  Mylan contends that this statement is misleading because Mylan has never stated that the amount of synergies would be the "exact same" regardless of whether it owns or merely controls Perrigo.

However, Perrigo's statement is best understood as representing Perrigo's belief as to what Mylan "would like" Perrigo shareholders to think it "<u>can</u> achieve," <u>id.</u> (emphasis added); it does not assert that Mylan has actually told Perrigo shareholders that, in either scenario, synergies would be exactly the same. While Mylan's Schedule TO carefully disclosed that Mylan "continues to believe that the offer will result in <u>at least</u> $800 million of annual pre-tax operational synergies," it also stated that the possibility of not owning all of Perrigo "does not change

43

any of Mylan's key assumptions regarding the categories of operational synergies available or the potential opportunity within each category." Wilson Decl., Ex. JJ at 77 (emphasis added). The latter statement suggests that Mylan has confidence that it retains the "potential" to realize the same synergies in a controlled-subsidiary situation, even though it disclosed the attendant risks of such an event and only specifically reaffirmed its belief in at least $800 million in synergies. While Perrigo's assertion in its 14D-9, like its claim before this Court, ignores that context, Perrigo's interpretation of what Mylan would like Perrigo shareholders to think it can achieve is not without foundation, and Perrigo is entitled to make its views of Mylan's strategy known to its shareholders. Requiring Perrigo to temper its "exact same" language would not advance Section 14(e)'s goal of "plac[ing] pertinent information before the shareholders of the target company and then . . . allow[ing] the shareholders to decide for themselves." Macfadden Holdings, 802 F.2d at 66.

**Abbott Laboratories:** Abbott is a health care and pharmaceutical company that owns 14.2% of Mylan's shares, making it Mylan's largest shareholder. In a presentation to investors on September 17, 2015, Perrigo included a slide titled "Mylan's Largest Shareholders--'Let Me Out,'" listing the "[s]ource" for the quoted language as "Mylan's shelf registration statement." Atkinson Decl., Ex. 5 at 10. The slide focused on the "significant

44

overhang in Mylan stock," stating that "Abbott Position Creates 14.2% Overhang" to "Add To 4.6% Teva Overhang." Id.  The slide also quoted Abbott CEO Miles White as stating in July 2015 that "'. . . we don't have intention long-term of being shareholders in Mylan.'" Id.  This quote, excerpted from a longer answer White gave on the subject of Mylan while on an earnings call, was used to support Perrigo's contention in the slide that "Mylan's largest shareholder has voted with its feet, seeking an exit by registering all their shares for sale." Id.

Shortly after Perrigo's investor presentation, Mylan brought a complaint before the Takeover Panel, arguing that Perrigo's slide was misleading because it implied that Abbott disapproved of Mylan's offer for Perrigo, even though Abbott had publicly endorsed the offer and voted its shares of Mylan stock in favor of the offer, and because it falsely implied that a sale of Abbott's holdings was imminent.  At the request of the Panel, Perrigo issued a supplemental disclosure on October 9 placing the statement that Abbott didn't "have intention long-term" of being Mylan shareholders in context by including more of White's answer from the July 2015 earnings call.  White's expanded answer in the supplemental disclosure included the following statements:  "On the other hand, I suppose you could say, well what's long-term?"; "[u]ntil we actually have to monetize that investment," Mylan "is a pretty good place to have our cash parked, because I think that

45

Mylan . . . is pursuing a strategy that I would endorse"; and "given our continued dealings with our partners at Mylan, . . . I like the strategy that Mylan is pursuing, and I support it and endorse it as a shareholder."  Wilson Opp. Decl., Ex. 8 at 1.

Mylan argues that this supplemental disclosure did not sufficiently negate the deceptive effects of Perrigo's investor presentation because the disclosure left out the portion of White's answer stating that the "Perrigo acquisition is something we clearly endorse" and "that's an independent decision by us," Atkinson Decl., Ex. 7 at PERRIGO_00003187, and did not clarify that Abbott has never said "let me out" or stated that it was seeking an exit because of the tender offer.

To the extent that Perrigo's investor presentation intimated that Abbott had announced an intent to sell its stake in Mylan in the immediate future, the supplemental disclosure identified its prior statement as having taken White's quote out of context and accurately communicated Abbott's true position:  Abbott did not intend to be a "long term" Mylan shareholder, but at least for the time being Mylan was "a pretty good place" to invest its cash and it supported the strategy Mylan was pursuing.  See Taro Pharm. Indus., Ltd. v. Sun Pharm. Indus., Ltd., No. 09 CIV. 8262 (PGG), 2010 WL 2835548, at *10 (S.D.N.Y. July 13, 2010) (logic underlying the "general rule" that a subsequent Section 13D filing curing a prior omission moots a Section 13(d) claim applies "with equal

force in the context of an asserted Section 14(e) violation" (internal quotation marks omitted)).  Further, while Perrigo did omit the portion of White's statement where he specifically affirmed his support for the Perrigo deal, the "'total mix' of information may also include information already in the public domain and facts known or reasonably available to the shareholders."  United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d 1190, 1199 (2d Cir. 1993) (other internal quotation marks omitted).  In light of Perrigo's supplemental disclosure that White "support[s]" and "endorse[s]" the "strategy that Mylan is pursuing" and Abbott's public endorsement of the Perrigo acquisition, a fact which the record indicates was widely disseminated in June 2015, see Atkinson Decl., Exs. 31, 32, the alleged omission is immaterial.[12]

**The "Dilutive" Nature of the Transaction:**  Appearing on CNBC's show "Squawk on the Street" on September 17, 2015, Papa, Perrigo's CEO and Chairman, responded to an interview question on the Mylan offer by stating in relevant part:  "We think that the financial math is very strong in our case.  Dilutive transaction on the growth rate.  It is going to be dilutive to our earnings per share."  Atkinson Decl., Ex. 24 at 2 (emphasis added).  The parties

---

[12] Mylan admitted that it has not gone back to the Takeover Panel to contend that Perrigo's supplemental disclosure did not comply with the Panel's original ruling, see Oral Argument Tr. at 4, suggesting that Mylan did not find the omission that significant.

47

appear to agree that the deal would only be dilutive to Mylan shareholders' earnings per share. Papa admits that he "should have used the word[s] 'their earnings per share.'" Papa Dep. at 21. Perrigo argues that Papa's statement was an immaterial mistake because a reasonable investor would not think to view the concept of accretion or dilution to earnings per share from the perspective of a target company in an acquisition. While Mylan responds that "[t]here can be little doubt that the market views accretion/dilution as potentially applying to both the target and acquirer shareholders," Reply Memorandum in Further Support of Defendant/Counterclaim-Plaintiff Mylan N.V.'s Motion for a Preliminary Injunction at 8, we find it notable that Mylan cites no source for that proposition whereas Perrigo supports its statement that dilution to earnings per share "refer[s] to a transaction's effect on the EPS of the acquirer" by citing to both financial textbooks and general reference websites, Perrigo Company PLC's Memorandum of Law in Opposition to Mylan N.V.'s Motion for a Preliminary Injunction at 12 & n.9.[13]

---

[13] Mylan does refer to an August 25 public ruling of the Takeover Panel, which found that a previous statement of Papa's referring to dilution breached the Irish Takeover Rules. The Panel ruled that the statement "'Mylan already proposed a dilutive deal that substantially undervalues Perrigo' . . . was unclear that the term 'dilutive' described the effect on Mylan shareholders as Mylan currently expects its proposed offer would be dilutive to its adjusted annual earnings per share for the first three years only . . ." Atkinson Decl., Ex. 26. However, the ruling does not state what was unclear about Papa's statement, which in any event did not tie the term "dilutive" to Perrigo's earnings per share. See Atkinson Decl., Ex. 19.

48

Further, on the same day as Papa's CNBC interview, Perrigo filed its Schedule 14D-9 with the SEC.  The Schedule 14D-9 formally conveyed the Perrigo board of directors' recommendation that Perrigo shareholders vote against the proposed offer.  See Atkinson Decl., Ex. 4 at 3.  The document included a section titled "The Offer will be dilutive to Mylan's adjusted EPS," id. at 10, and specifically advised shareholders that "[a]ny reference to dilution" in the document "is to the effect of the Offer on Mylan shares," id. at C-27 (emphasis added).  It made no reference to any dilutive effect on Perrigo's earnings per share, despite listing numerous reasons for Perrigo shareholders to reject the offer.  See id. at 7-16.  Viewing Papa's statement in its proper context, i.e., as a remark made during an interview on live television, and considering Perrigo's contemporaneous statements in its filing and the typical use of the terms "dilutive to earnings per share," we are not persuaded as to the materiality of Papa's misstatement.

**The Offer Premium**:  In its September 17 presentation to investors, Perrigo included a slide stating that "Mylan's Offer Represents the Lowest Premium to an Unaffected Share Price of Any Biopharma Transaction >$5Bn in Value Since the Start of 2012." Atkinson Decl., Ex. 5 at 8.  The slide presented a chart displaying offer premiums in recent biopharmaceutical transactions from largest to smallest, with the smallest premium of "14%" attributed

49

to "Perrigo / Mylan." Id. The slide disclosed that the 14% figure was based on "Mylan's closing share price of $49.01 on September 16, 2015," and Perrigo's "Unaffected Share Price," id., which the previous slide made clear was Perrigo's share price as of "April 7, 2015, the day prior to Mylan's publicly releasing their initial proposal for Perrigo," id. at 7.   Mylan contends that Perrigo misleadingly used "mismatched dates to create an apples-to-oranges comparison," and that if Perrigo used the unaffected April 7, 2015 stock price for Perrigo, it should have also used Mylan's stock price from the same date.   Memorandum of Law in Support of Defendant/Counterclaim-Plaintiff   Mylan   N.V.'s   Motion   for Preliminary Injunction ("Mylan Mem.") at 21.   Alternatively, Mylan argues that Perrigo should have used Mylan's share price of $55.30 on March 10, 2015, the day before rumors emerged about the ultimately unsuccessful attempt by Teva Pharmaceutical Industries Ltd. to acquire Mylan, because that represented Mylan's true unaffected share price.

However, the method Perrigo used to calculate the 14% premium is clearly disclosed on the slide at issue, and as confirmed at oral argument, all of the other premiums in tender offers represented in the chart were calculated consistently with that method.  See Oral Argument Tr. at 54.  There is no misstatement or omission in the slide itself.  Mylan instead is limited to arguing that the slide utilized an inherently deceptive methodology for

calculating an offer premium, and that Perrigo should have used a different one.  Yet Mylan and Perrigo each submitted evidence that supports their respective proposed methods of calculating an offer premium.  See, e.g., Wilson Opp. Decl., Ex. 13 at 7 (offer by Kraft Foods Inc. for Cadbury PLC calculating premium by comparing most recent closing share price of Kraft to unaffected share price of Cadbury); Atkinson Decl., Ex. 8 at 6-7 (August 12, 2015 Morgan Stanley presentation to Perrigo's board of directors referring repeatedly to Mylan's "unaffected" price as Mylan's share price on March 10, and separately noting Mylan's "Latest Closing Price" of August 7).  Accordingly, "the critical key[s] to understanding [Perrigo's] methodology" were disclosed, and Mylan has not demonstrated at this stage that "defendants used one calculation method when another is mandated by industry practice, generally accepted accounting principles or federal securities regulations." In re Netflix, Inc. Sec. Litig., No. C 04-2978 WHA, 2005 WL 3096209, at *9 (N.D. Cal. Nov. 18, 2005).  Indeed, by arguing that there are a "number of fair ways to calculate the premium Mylan has offered to Perrigo shareholders," Mylan Mem. at 23, Mylan suggests that there is no uniform way to calculate an offer premium in a tender offer.  Mylan's complaints concerning the Perrigo offer premium slide do not give rise to a Section 14(e) claim.  See Ironworkers Local 580--Joint Funds v. Linn Energy, LLC, 29 F. Supp. 3d 400, 427 (S.D.N.Y. 2014) ("Plaintiffs' argument about the

51

'proper' method of calculating DCF makes little sense where, as here, there is no recognized 'proper' method of making such calculation.").

## CONCLUSION

For the reasons set forth in this opinion, [14] the Court denies Perrigo's and Mylan's motions for a preliminary injunction.

**SO ORDERED.**

Dated:    New York, New York
          October 29, 2015

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[14] Having determined that the parties have neither established a likelihood of success on the merits nor sufficiently serious questions going to the merits, we need not consider the "irreparable harm" and "public interest" elements of the preliminary injunction analysis.